TRYON v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:TRYON v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 TRYON v. STATE
2018 OK CR 20
Case Number: D-2015-331
Decided: 05/31/2018
ISAIAH GLENNDELL TRYON, Appellant v. STATE OF OKLAHOMA, Appellee.
Cite as: 2018 OK CR 20, __ __

 

 

O P I N I O N

HUDSON, JUDGE:

¶1 Appellant, Isaiah Glenndell Tryon, was tried by jury in the District Court of Oklahoma County, Case No. CF-2012-1692, and convicted of Murder in the First Degree in violation of 21 O.S.2011, § 701.7(A). In a separate capital sentencing phase, Appellant's jury found the existence of four statutory aggravating circumstances[1] and sentenced Appellant to death. The Honorable Cindy H. Truong, District Judge, presided over the trial and pronounced judgment and sentence accordingly. Appellant now appeals his conviction and death sentence. We affirm.

BACKGROUND

¶2 On March 16, 2012, around 10:30 a.m., Appellant fatally stabbed Tia Bloomer inside the Metro Transit bus station in downtown Oklahoma City. Tia recently broke off her relationship with Appellant due in part to his inability to support their infant child. Appellant was terminally unemployed and drew as income a meager $628.00 a month in Social Security disability benefits. The couple too had a stormy relationship. The day before her death--March 15, 2012--Tia called Detective Jeffrey Padgett of the Oklahoma City Police Department (OCPD) Domestic Violence Unit to schedule a follow-up interview for an assault case in which she was the named victim. Tia previously denied to authorities that Appellant had assaulted her. Instead, she claimed another man had assaulted her.

¶3 During her phone conversation with Detective Padgett, Tia repeated this claim but agreed nonetheless to meet the next day. Later that night, Tia sent Appellant a text message stating the following:

It's okay bc im [sic] going to tell the truth tomorrow. I'm tired of holding lies for yhu [sic]. Isaiah Tryon is the guy who choked nd [sic] nearly killed me Saturday.

(State's Ex. 38).

¶4 The next day, Appellant accosted Tia inside the downtown bus station while she was talking on her cell phone. Surveillance video from inside the terminal showed Appellant speaking to Tia before stabbing her repeatedly with a knife. Immediately before this brutal attack, an eyewitness heard Tia yell for Appellant to leave her alone. Appellant then stabbed Tia in the neck with the knife, causing blood to gush out from her neck. The surveillance video shows Appellant grabbing the victim then stabbing her when she tried to leave the terminal building. Appellant stabbed the victim repeatedly after she fell to the floor. The victim said "help" as Appellant continued stabbing her repeatedly and blood gushed out of her wounds. During the attack, several bystanders unsuccessfully attempted to pull Appellant off the victim. At one point, a bystander can be seen on the surveillance video dragging Appellant across the floor while Appellant held on to Tia and continued stabbing her.

¶5 Appellant released his grip on the victim only after Kenneth Burke, a security guard, sprayed him in the face with pepper spray. The security guard then forced Appellant to the ground, handcuffed him and ordered the frantic crowd to move away both from Appellant and the bloody scene surrounding the victim's body. A bloody serrated knife with a bent blade was found resting a short distance away on the floor.

¶6 While waiting for police to arrive, Burke checked on the victim but found no signs of life. Paramedics soon arrived and decided to transport the victim to the hospital because they detected a faint pulse. Despite the efforts of emergency responders, Tia died from her injuries. The medical examiner autopsied the victim and found seven (7) stab wounds to her head, neck, back, torso and right hand. Several superficial cuts were also observed on the victim's face and the back of her neck. The medical examiner testified these cuts were consistent with having been made by a serrated blade. The cause of death was multiple stab wounds. In addition to these injuries, the medical examiner observed redness and heavy congestion in the victim's eyes. The medical examiner did not associate this congestion with the victim's stab wounds but testified it is sometimes found in cases of strangulation.

¶7 OCPD Lieutenant Brian Bennett was one of the first officers on the scene. He removed Appellant from the ground and escorted him out of the bus station. Because Appellant had a great deal of blood on his hands and clothing, Lt. Bennett asked whether Appellant needed medical treatment. Appellant replied that he did not. Appellant said he was not injured and all of the blood on him "was hers." Appellant was nonetheless transported to nearby St. Anthony's Hospital where he was treated for cuts to his hand. When asked by a doctor about these injuries, Appellant calmly responded that he had stabbed his girlfriend.

¶8 After being released from the hospital, Appellant was transported to police headquarters. There, he was read the Miranda[2] warning by OCPD Detective Robert Benavides and agreed to talk. During his interview, Appellant admitted stabbing Tia repeatedly while inside the bus terminal. Appellant said he stabbed the victim six times with a kitchen knife he brought from home. Appellant explained that he and Tia recently broke up and that they had been fighting over his support of their infant son. When Appellant saw Tia at the bus station, he walked up and tried to talk with her about their problems. Tia refused and told Appellant to get away from her. That is when Appellant said he pulled out his knife and began stabbing her.

¶9 Appellant claimed he did not know Tia would be at the bus station that morning or that he would even see her that day. Appellant did know, however, that Tia had some business to take care of that day. Appellant admitted bringing the knife with him because if he saw Tia, he planned to stab her. Appellant said Tia was facing him when he grabbed her and started stabbing her in the neck. Appellant described how he continued stabbing Tia after she fell to the ground and how he kept hold of her arm. Appellant said he was sad and depressed when he stabbed Tia because he didn't want to be without her. Nor did he want anyone else to be with her. Appellant did not believe he could find someone else to be with. Appellant admitted that what he did to Tia "wasn't right." At one point during the interview, Appellant demanded protective custody because "people ain't gonna like that type of shit" and would try to kill him in the county jail.

¶10 During the interview, Appellant asked whether Tia was okay. Detective Benavides promised to let him know about Tia's condition as soon as he found out. When informed by Detective Benavides at the end of the interview that Tia did not survive her injuries and was dead, Appellant showed no emotion to this news.

JURY SELECTION

¶11 In Proposition I, Appellant complains that the trial court violated due process by limiting the questions defense counsel was allowed to ask of the prospective jurors. Appellant says the trial court improperly restricted the questions he was allowed to ask the venire panel concerning their views on both the death penalty and mitigating evidence. This, Appellant says, limited his ability to ask questions which would provide the information needed to intelligently exercise his peremptory challenges.

¶12 The Supreme Court has recognized that a critical part of the constitutional right to an impartial jury is "an adequate voir dire to identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 729, 112 S. Ct. 2222, 2230, 119 L. Ed. 2d 492 (1992). "The purpose of voir dire examination is to discover whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges." Harmon v. State, 2011 OK CR 6, ¶ 7, 248 P.3d 918, 927 (citation omitted). Rule 6 of the Rules of the District Courts, Title 12, O.S.2011, Ch.2, App., requires both the State and defense have a "reasonable opportunity to supplement" the trial court's examination of prospective jurors. Mayes v. State, 1994 OK CR 44, ¶ 15, 887 P.2d 1288, 1298.

¶13 Yet, this right is not unlimited. The manner and extent of examination of jurors is not "prescribed by any definite, unyielding rule, but instead rests in the sound discretion of the trial judge." Id. Towards that end, Rule 6 directs that "[c]ounsel shall scrupulously guard against injecting any argument in their voir dire examination and shall refrain from asking a juror how he would decide hypothetical questions involving law or facts." The trial court retains broad discretion in restricting questions "that are repetitive, irrelevant or regard legal issues upon which the trial court will instruct the jury." Harmon, 2011 OK CR 6, ¶ 7, 248 P.3d at 927. "There is no abuse of discretion as long as the voir dire examination affords the defendant a jury free of outside influence, bias or personal interest." Id. Where, as here, a defendant challenges the restrictions placed upon his voir dire examination, the question is whether the trial court's actions rendered his trial fundamentally unfair. Morgan, 504 U.S. at 730, 112 S. Ct. at 2230.[3]

¶14 Appellant challenges six separate instances in which the trial court restricted his examination of prospective jurors. In the first instance, defense counsel described for the prospective jurors a "hypothetical situation" in which a defendant is convicted of "intentional first degree murder of a person who committed malice aforethought murder, planned it, intended to do it, did it of an innocent person." Defense counsel then asked:

 

I want to know what each of your individual feelings are about the death penalty under that situation for a person who's guilty of malice aforethought murder.

(Tr. I 248).

¶15 The prosecutor immediately objected and, at a bench conference, argued defense counsel was impermissibly posing a hypothetical scenario to the jury by "running his facts of this case by them, and wanting to know are they predisposed to consider any of these three punishments." Defense counsel responded that Appellant had a constitutional right under Morgan v. Illinois, supra, to ask the challenged question. Defense counsel urged that he could only ascertain whether the prospective jurors would automatically vote for the death penalty if they first knew "what first degree murder is. It doesn't involve heat of passion, doesn't involve some of the other things." The trial court stated it would provide definitions and sustained the objection.

¶16 The trial court did not abuse its discretion in limiting defense counsel's voir dire in this manner. In the challenged passage, defense counsel was attempting to ascertain what sentences the prospective jurors would give based on a "hypothetical" scenario drawn from the facts of the case. This is impermissible under our decisions. See Robinson v. State, 2011 OK CR 15, ¶ 16, 255 P.3d 425, 432-33 ("An attorney should not use voir dire to test prospective jurors' willingness to accept a party's theory of the case, rather than the juror's impartiality[.]"); Black v. State, 2001 OK CR 5, ¶ 19, 21 P.3d 1047, 1058 ("When counsel attempted to ask questions dealing specifically with the facts of this case or to give hypotheticals based on the facts of this case, the trial court properly sustained the State's objections."); Bernay v. State, 1999 OK CR 37, ¶¶ 9-11, 989 P.2d 998, 1005-06 (no abuse of discretion where defense counsel was prohibited from attempting to rehabilitate six prospective jurors using "specific or hypothetical factual patterns under which the prospective juror might consider the death penalty appropriate."); Jackson v. State, 1998 OK CR 39, ¶ 12, 964 P.2d 875, 883 (no abuse of discretion where the trial court restricted voir dire questioning regarding legal issues upon which the trial court would instruct).

¶17 Appellant's citation to Morgan v. Illinois does not support his claim. Morgan held that due process of law mandates that a capital defendant must be allowed, upon request, to ask whether a prospective juror would automatically impose the death penalty upon conviction of the defendant no matter what the facts are. Morgan, 504 U.S. at 721, 735-36, 112 S. Ct. at 2233. The fact-intensive question posed by Appellant did not address this issue. There is a difference between 1) asking whether a prospective juror would automatically impose the death penalty, regardless of the facts of the case, upon the defendant's conviction for first degree murder; and 2) asking prospective jurors to prejudge the appropriate sentence in light of the supposed facts of the case. Defense counsel was engaged in the latter exercise which we have found impermissible. Lovell v. State, 1969 OK CR 177, ¶¶ 9-10, 455 P.2d 735, 738 (hypothetical questions designed "to have jurors indicate in advance what their decision will be under certain state of evidence or upon a certain state of facts" are improper) (citation omitted). Morgan does not require such questioning.[4]

¶18 The remaining defense questions disallowed by the trial court are of similar ilk. Asking prospective jurors what they would want to know about a person before sentencing them to death; whether jurors could realistically consider life with the possibility of parole where the murder victim was the defendant's girlfriend and mother of his baby; and whether jurors could imagine imposing life with the possibility of parole for a defendant who killed a loved one as opposed to a stranger are the types of questions we have previously ruled impermissible. Frederick v. State, 2017 OK CR 12, ¶¶ 22-28, 400 P.3d 786, 802-03 (no abuse of discretion where trial court disallowed defense questioning of prospective jurors about their ability to consider all three possible punishments in the event appellant was convicted of murdering his mother); Harmon, 2011 OK CR 6, ¶ 9 n.3, 248 P.3d at 927 n.3 (finding the trial court properly limited defense voir dire asking, inter alia, "which punishment [a juror] would favor if the State proved Harmon killed a convenience store clerk[,]" "the kinds of circumstances that would warrant the death penalty[,]" and "what the jurors thought were proper circumstances to consider in deciding punishment and what circumstances jurors thought deserved the death penalty."); Lovell, 1969 OK CR 177, ¶¶ 9-10, 455 P.2d at 738 (prosecutor's question whether any of the prospective jurors "would not send [the defendant] to the penitentiary if the evidence shows that he was guilty of driving while under the influence of liquor, after former conviction" was improper).

 

¶19 The limitations imposed upon the defense voir dire in this case were proper. Despite the restrictions, defense counsel was nonetheless allowed to question several jurors about whether they could consider a life sentence with the possibility of parole where the victim is a loved one and the mother of a child; whether they understood that first degree malice aforethought murder involves an intentional killing; their feelings on the death penalty for an intentional murder; and whether they could consider all three punishments for someone convicted of an intentional malice aforethought killing. Moreover, the record shows defense counsel was afforded an adequate voir dire which allowed Appellant to probe the jurors' attitudes toward the death penalty and potential mitigating circumstances in the case.

¶20 Under the total circumstances, the trial court did not abuse its discretion in limiting the defense voir dire. Appellant was provided an adequate voir dire to identify unqualified jurors and intelligently exercise his peremptory challenges. Appellant's trial was not rendered fundamentally unfair from the trial court's limitations on voir dire. Proposition I is denied.

¶21 In Proposition II, Appellant complains that Prospective Jurors K.T. and A.F. should have been removed for cause. K.T. sat as a juror. A.F., however, was removed with the fifth defense peremptory. We have held that:

In order to properly preserve for appellate review an objection to a denial of a challenge for cause, a defendant must demonstrate that he was forced over objection to keep an unacceptable juror. This requires a defendant to excuse the challenged juror with a peremptory challenge and make a record of which remaining jurors the defendant would have excused had he not used that peremptory challenge to cure the trial court's alleged erroneous denial of the for cause challenge.

Eizember v. State, 2007 OK CR 29, ¶ 36, 164 P.3d 208, 220 (internal citations omitted). Here, Appellant challenged the ability of both K.T. and A.F. to be impartial and renewed his challenges at the conclusion of voir dire. Appellant preserved his for-cause challenge to A.F. by using a peremptory challenge against him, requesting additional peremptory challenges and effectively identifying three other jurors he would have excused--R.G., P.S. or K.T.--with the peremptory challenge he used to remove A.F.

¶22 Appellant failed to preserve his for-cause challenge to K.T., however, by 1) failing to excuse her with an available peremptory challenge and 2) using peremptory challenges against other prospective jurors whom he failed to claim could not be impartial. Our review of the trial court's handling of Appellant's for-cause challenge to K.T. is thus waived for all but plain error. Id., 2007 OK CR 29, ¶ 48, 164 P.3d at 223.

¶23 The trial court used the struck juror method of jury selection in which thirty (30) prospective jurors were seated and systematically questioned by the court and parties. Judge Truong initiated the questioning of the prospective jurors then allowed counsel for both parties to question the prospective jurors. When prospective jurors were excused, they were replaced so that thirty prospective jurors remained on the panel.

¶24 At the conclusion of the State's questioning, the prosecutor passed the panel for cause. At the conclusion of the defense questioning, defense counsel announced he had no further questions of the venire panel but refused to pass the panel for cause. Instead, defense counsel made a lengthy record complaining about the trial court's limitations on his voir dire examination. This argument was based largely on the same issues raised by Appellant in Proposition I above. At the conclusion of this argument, defense counsel read for the court the names of twelve prospective jurors he said should be removed for cause in light of the trial court's restrictions on defense counsel's voir dire of the prospective jurors. Defense counsel stated that prospective jurors W.T., N.M., M.V., La.H., B.M., J.F., Ly.H., A.F., K.T., D.W., R.G. and P.S. should be removed for cause. Notably, with the exception of A.F. and K.T., Appellant did not challenge any of these prospective jurors for cause earlier in the voir dire.

¶25 The trial court denied Appellant's motion to strike these particular jurors. Defense counsel then requested nine extra peremptory challenges "because you are requiring us to use peremptory challenges to kick people that should have been kicked because they were excusable for cause." The trial court too denied this request. Both parties then exercised nine peremptory challenges each, leaving twelve jurors to hear the case. Defense counsel used peremptory challenges to remove prospective jurors W.T., N.M., M.V., La.H., A.F., B.M., J.F., Ly.H., D.W.--nine of the twelve prospective jurors defense counsel identified just moments earlier as ones who should be removed for cause based on the trial court's limitations on the defense voir dire. Ultimately, K.T., P.S. and R.G. survived the exercise of peremptory challenges by both parties and sat on the jury.

¶26 Appellant made a conscious decision not to remove K.T. with any of the eight peremptory challenges he used against prospective jurors who were, in effect, not properly challenged for cause. In Proposition I, we rejected Appellant's challenge to the trial court's limitations on the defense voir dire. Moreover, Appellant never challenged these eight prospective jurors on any other grounds. By failing to excuse K.T., who was challenged for cause well before the end of the voir dire on grounds unrelated to the trial court's restrictions on voir dire, Appellant has waived all but plain error relating to K.T.'s placement on the jury. Appellant may have had a difficult choice in determining whether to strike K.T. from the jury panel. But, as the Supreme Court has observed in this context, "[a] hard choice is not the same as no choice." United States v. Martinez-Salazar, 528 U.S. 304, 315, 120 S. Ct. 774, 781, 145 L. Ed. 2d 792 (2000).

¶27 We now turn to the merits of Appellant's challenges to A.F. and K.T. Appellant says the trial court was required to remove prospective juror A.F. for cause. Appellant argues that A.F.'s answers during defense voir dire showed A.F. could not uphold the juror's oath due to his inability to consider all three sentencing options. Specifically, Appellant points to A.F.'s responses concerning his ability to consider the sentence of life imprisonment with the possibility of parole.

¶28 We have stated the following standard of review for resolving challenges of this type:

The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" [Waiwright v.] Witt, 469 U.S. [412], at 424, 105 S. Ct. [844], at 852, [83 L. Ed. 2d 841 (1985)]. See also Gray v. Mississippi, 481 U.S. 648, 658, 107 S. Ct. 2045, 2051, 95 L. Ed. 2d 622 (1987). Inherent in this determination is that the potential juror has been fully informed of the law and his or her responsibilities under the law and oath of a juror. This standard does not require a juror's bias be proved with unmistakable clarity; neither must the juror express an intention to vote against the death penalty automatically. Witt, 469 U.S. at 425, 105 S. Ct. at 852. "Deference must be paid to the trial judge who sees and hears the jurors". Id., 469 U.S. at 425, 105 S. Ct. at 853. See also Uttecht v. Brown, 551 U.S. 1, 127 S. Ct. 2218, 2224, 167 L. Ed. 2d 1014 (2007) ("deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.").

This Court has adhered to the principles set forth in Witt. See Glossip v. State, 2007 OK CR 12, ¶¶ 31-33, 157 P.3d 143, 150-51; Williams v. State, 2001 OK CR 9, ¶ 10, 22 P.3d 702, 709 (and cases cited therein). We have said the Witt standard only requires that each juror be willing to consider each of the three statutory punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment (with the possibility of parole). Glossip, 2007 OK CR 12at ¶ 31, 157 P.3d at 150. See also Williams, 2001 OK CR 9at ¶ 10, 22 P.3d at 709-10. Further, all doubts regarding juror impartiality must be resolved in favor of the accused. Williams, 2001 OK CR 9at ¶ 10, 22 P.3d at 709-10. This Court will look to the entirety of the juror's voir dire examination to determine if the trial court properly excused the juror for cause. Id. As the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion. Id.

Eizember, 2007 OK CR 29, ¶¶ 41-42, 164 P.3d at 221-22.

¶29 We find prospective juror A.F.'s answers do not show that his views on the life with possibility of parole sentencing option would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. A.F. provided inconsistent responses concerning his ability to give meaningful consideration to the life imprisonment sentencing option where the victim was a loved one. When admonished by the trial court to set aside counsel's characterization of the victim's relationship with the defendant because the jury had not heard evidence relating to it, A.F. made clear that he could listen to all the evidence and give meaningful consideration to all three sentencing options. Even after the trial court's questioning, A.F.'s responses to defense counsel's questions revealed his ability to give fair and meaningful consideration to a life sentence--even though personally he did not see it as a desirable sentencing option for the murder of a loved one.

¶30 We give broad deference on appeal to the trial court's rulings on for-cause challenges precisely because of the situation presented here. "A trial court's 'finding may be upheld even in the absence of clear statements from the juror that he or she is impaired . . . .'" White v. Wheeler, __U.S.__, 136 S. Ct. 456, 460, 193 L. Ed. 2d 384 (2015) (quoting Uttecht, 551 U.S. at 7, 127 S. Ct. at 2223). That is because we are presented on appeal simply with the cold face of the record. The trial court, by contrast, was able to see and hear prospective juror A.F. Judge Truong was in a superior position to make the credibility determinations critical to determining A.F.'s qualifications to serve. The Supreme Court has made clear that "when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State." Uttecht, 551 U.S. at 7, 127 S. Ct. at 2223 (quoting Witt, 469 U.S. at 434, 105 S. Ct. at 857); Accord White, 136 S. Ct. at 461. We afford that type of broad deference in the present case in denying relief for Appellant's challenge to prospective juror A.F.

¶31 We will reverse the lower court's ruling on a for-cause challenge where there is no support for it in the record. Uttecht, 551 U.S. at 20, 127 S. Ct. at 2230 ("The need to defer to the trial court's ability to perceive jurors' demeanor does not foreclose the possibility that a reviewing court may reverse the trial court's decision where the record discloses no basis for a finding of substantial impairment."). But where, as here, the record demonstrates a thorough vetting of the prospective juror's views and we are left simply with ambiguous responses, the trial court's ruling will be honored on appeal. We are not faced in the present case with a prospective juror who would automatically vote for, or against, any one of the three penalty options. Nor were A.F.'s responses such that he was substantially impaired in his ability to fairly consider and impose a life sentence--even if the victim was a loved one of the defendant.

¶32 Thus, we find the trial court did not abuse its discretion in denying Appellant's request to remove prospective juror A.F. from the venire panel. See Myers v. State, 2006 OK CR 12, ¶¶ 6-9, 133 P.3d 312, 320-21, overruled on other grounds, Davis v. State, 2018 OK CR 7, ¶ 26 n.3, __P.3d.__. The record does not show A.F.'s views on the life imprisonment sentencing option would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. We deny relief for this aspect of Appellant's Proposition II claim.

¶33 We likewise find no plain error from the trial court's refusal to remove prospective juror K.T. Under the plain error test, an appellant must show an actual error, that is plain or obvious, affecting his substantial rights. This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. Jackson v. State, 2016 OK CR 5, ¶ 4, 371 P.3d 1120, 1121.

¶34 Appellant argues K.T. should have been removed for cause for actual bias. See 22 O.S.2011, § 659 (defining "actual bias" as "the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging . . . .").

¶35 The record shows K.T. initially provided inconsistent answers concerning her ability to set aside her previous experiences with domestic violence. As K.T. went further along in the questioning, however, it became evident that she could in fact set aside her personal experiences and render a fair and impartial verdict based solely on the evidence admitted in court. She made clear--particularly in her final responses to the court and defense counsel--that she could do this. The record shows too that, as the parties and court explained what the law required of her, K.T.'s initial concerns about her ability to be fair and impartial vanished. This is not atypical in capital voir dire and hardly a basis for removing a prospective juror for cause. Davis v. State, 2011 OK CR 29, ¶¶ 41-42, 268 P.3d 86, 105. "Any ambiguity or inconsistencies in her responses were subject to resolution by the trial court. Having benefit of observing [K.T.'s] demeanor throughout voir dire, the court found her responses credible and insufficient to excuse her for cause." Id., 2011 OK CR 29, ¶ 42, 268 P.3d at 105. Our review of the totality of K.T.'s voir dire supports the trial court's decision. The trial court therefore did not abuse its discretion in denying Appellant's for-cause challenge to K.T. Because there was no error, there is no plain error warranting relief based on this claim. Pullen v. State, 2016 OK CR 18, ¶ 8, 387 P.3d 922, 926.

¶36 Finally, because the trial court did not abuse its discretion in failing to remove prospective jurors A.F. and K.T., we need not address whether Appellant was entitled to additional peremptory challenges. Davis, 2011 OK CR 29, ¶ 43, 268 P.3d. at 105. Proposition II is denied.

ALLEGED EVIDENTIARY ERROR

¶37 In Proposition III, Appellant challenges the admission of State's Exhibit 38, the text message sent from Tia Bloomer to Appellant the night before the killing, which stated:

It's okay bc im [sic] going to tell the truth tomorrow. I'm tired of holding lies for yhu [sic]. Isaiah Tryon is the guy who choked nd [sic] nearly killed me Saturday.

(State's Ex. 38). Appellant argues this text message was testimonial and, thus, its admission violated his Sixth Amendment right to confrontation of witnesses. He also argues it was inadmissible hearsay under state evidence rules. The trial court admitted the text message, finding it was not offered to prove the truth of the matter asserted but, rather, was relevant simply because the text message was sent to Appellant and was probative on the issue of Appellant's motive to commit the murder the next morning.

¶38 We typically review a trial court's decision to admit evidence for an abuse of discretion. However, "the determination of whether admission of hearsay evidence violates the Confrontation Clause . . . is a question of law we review de novo." Hanson v. State, 2009 OK CR 13, ¶ 8, 206 P.3d 1020, 1025. We note too Appellant did not preserve his current Confrontation Clause challenge to the admission of State's Exhibit 38. Appellant raised numerous objections on state law grounds to this evidence at the pre-trial hearing. Appellant renewed these same objections at trial. At no point below did Appellant assert a claim that the admission of State's Exhibit 38 was a constitutional violation. Appellant has therefore waived review of his constitutional claim for all but plain error. Miller v. State, 2013 OK CR 11, ¶ 104, 313 P.3d 934, 971.

¶39 Appellant fails to show plain error. The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Sixth Amendment's Confrontation Clause has been extended to the States through the Fourteenth Amendment for over fifty years. See Richardson v. Marsh, 481 U.S. 200, 206, 107 S. Ct. 1702, 1706-07, 95 L. Ed. 2d 176 (1987) (citing Pointer v. Texas, 380 U.S. 400, 404, 406-07, 85 S. Ct. 1065, 1068, 1069-70, 13 L. Ed. 2d 923 (1965)). In Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Supreme Court held that under the Sixth Amendment, testimonial out-of-court statements may be admitted against the accused in a criminal trial only 1) when the declarant is unavailable and 2) the defendant has had a previous opportunity to cross-examine the declarant. Id., 541 U.S. at 51, 68, 124 S. Ct. at 1364, 1374.

¶40 "Statements not offered to prove the truth of the matter asserted are generally admissible." Primeaux v. State, 2004 OK CR 16, ¶ 39, 88 P.3d 893, 902. Further, the Supreme Court has held that the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. Crawford, 541 U.S. at 59-60 n.9, 124 S. Ct. at 1369 n.9 (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985)); Andrew v. State, 2007 OK CR 23, ¶ 31, 164 P.3d 176, 189.

¶41 In the present case, assuming arguendo the text message was offered to prove the truth of the matter asserted, Appellant's Sixth Amendment claim fails because the victim's text message to Appellant was nontestimonial. Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 2273, 165 L. Ed. 2d 224 (2006) (only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause"); See also Michigan v. Bryant, 562 U.S. 344, 354, 131 S. Ct. 1143, 1153, 179 L. Ed. 2d 93 (2011) (noting that Crawford limited the Confrontation Clause's reach to testimonial statements); Whorton v. Bockting, 549 U.S. 406, 420, 127 S. Ct. 1173, 1183, 167 L. Ed. 2d 1 (2007) (the Confrontation Clause has no application to out-of-court nontestimonial statements under Crawford).

¶42 The victim's text message to Appellant was not made in the context of a police interview. Nor was it made in response to police questioning. See Crawford, 541 U.S. at 51, 68, 124 S. Ct. at 1364, 1374. It is an informal three-sentence message, riddled with spelling errors, which on its face appears to be a threat to Appellant. There is no evidence suggesting the message was written so that it could be used later as evidence in a formal court proceeding, let alone that the primary purpose of the message was to create an out-of-court substitute for trial testimony. See Ohio v. Clark, __U.S.__, 135 S. Ct. 2173, 2181, 192 L. Ed. 2d 306 (2015). Rather, the content and circumstances in which the text message was sent shows it was simply an informal message sent by the victim through her cell phone to Appellant's cell phone the night before her murder and was never disclosed to third parties. Under the total circumstances, State's Exhibit 38 was unquestionably nontestimonial and, thus, not subject to the Confrontation Clause. See Clark, 135 S. Ct. at 2180, 2182 (the informality of the situation in which the statement was made is a relevant factor in determining whether it was testimonial or nontestimonial); ("Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers."). The statements at issue resemble (if not typify) the casual remark to an acquaintance Crawford said was not testimonial, Crawford, 541 U.S. at 51, 124 S. Ct. at 1364, as well as the "[s]tatements to friends and neighbors about abuse and intimidation" the Court likewise held in Giles v. California 554 U.S. 353, 376, 128 S. Ct. 2678, 2692-93, 171 L. Ed. 2d 488 (2008) were not subject to the Confrontation Clause. Thus, there is no constitutional error arising from the admission of State's Exhibit 38 and, thus, no plain error. Frederick, 2017 OK CR 12, ¶ 14, 400 P.3d at 800 ("Finding no error, we find no plain error.").

¶43 There remains the matter of the specific basis for admissibility of the text message under state evidence rules again assuming arguendo it was hearsay. Bryant, 562 U.S. at 358-59, 131 S. Ct. at 1155 ("when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony . . . the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."). This issue caused considerable confusion below. Appellant maintains on appeal that State's Exhibit 38 was inadmissible hearsay.

¶44 In making this determination, it is helpful to realize that the text message itself is actually composed of three separate sentences. The first two sentences ("It's okay bc im [sic] going to tell the truth tomorrow. I'm tired of holding lies for yhu [sic].") were unquestionably admissible hearsay under the state of mind exception to indicate the declarant's intent toward future conduct and as a direct statement of her state of mind. 12 O.S.2011, § 2803(3) ("A statement of the declarant's then existing state of mind . . . such as intent, plan, motive, design, mental feeling . . ." is not excluded by the hearsay rule). See Frederick v. State, 2001 OK CR 34, ¶ 98, 37 P.3d 908, 935; Davis v. State, 1983 OK CR 57, ¶ 48, 665 P.2d 1186, 1198.

¶45 The third and final sentence of the text message ("Isaiah Tryon is the guy who choked nd [sic] nearly killed me Saturday") was also arguably admissible under the state of mind exception. 12 O.S.2011, § 2803(3). We have held in domestic homicide cases that "[a] victim's hearsay statements describing threats and beatings are admissible to show the victim's state of mind and indicate fear of a defendant . . . evidence of prior threats, assaults, and battery on a victim is proper to show the victim's state of mind[.]" Hooper v. State, 1997 OK CR 64, ¶ 28, 947 P.2d 1090, 1102. True, Section 2803(3) expressly disallows the admission of "a statement of memory or belief to prove the fact remembered or believed[.]" Consistent with this provision, our cases have expressly distinguished between admissible evidence of prior threats, assaults, and battery on a victim showing the victim's state of mind from "a specific description of a defendant's actions" such as grabbing a gun or pulling the phone out of the wall which we have deemed inadmissible. Hooper, 1997 OK CR 64, ¶ 28, 947 P.2d at 1102. Cf. Andrew v. State, 2007 OK CR 23, ¶ 30, 164 P.3d at 189 (victim's recorded antecedent declaration to Prudential Insurance representatives of his belief that his wife and her lover tried to kill him by cutting the brake lines to his car was admissible under the state of mind exception to show victim's fear and to provide motive); Lamb v. State, 1988 OK CR 296, ¶¶ 7-8, 767 P.2d 887, 890 (testimony by witnesses that murder victim told them that the defendant, her husband, had previously committed battery on her, had threatened her and that she was afraid of him admissible under state of mind exception).

¶46 We need not reach this issue however because assuming arguendo error, admission of the third sentence in the text message was nonetheless harmless. The properly-admitted portion of the text message, combined with the domestic violence evidence introduced by the State during the trial's first stage, constituted strong evidence identifying Appellant as the perpetrator of this previous attack and showing motive for the killing. Moreover, the videotape of the killing itself represented overwhelming evidence demonstrating Appellant's responsibility for the victim's death and that the murder was committed with malice aforethought. Under the total circumstances, any imaginable error from admission of the third sentence in the text message was harmless and did not contribute to the verdict or sentence given the strong evidence against Appellant. Proposition III is denied. 20 O.S.2011, § 3001.1.

¶47 In Proposition IV, Appellant complains that the trial court prevented him from presenting a defense by disallowing questions to defense witnesses Rico Wilson and Eric Wilson as to whether Appellant made any threats towards the victim in the days leading up to the murder or had otherwise mentioned receiving the text message discussed in Proposition III. Rico Wilson is Appellant's brother. Rico testified that he saw Appellant standing in front of his mother's apartment around 9:30 or 10:00 p.m. the night before the murder and that Appellant appeared to be high on drugs at the time. Rico testified too that Appellant was "probably" drinking then because Appellant had been drinking earlier in the day. Rico saw Appellant several times previously during the week leading up to the murder. Rico saw Appellant snorting cocaine and using PCP earlier in the week.

¶48 Eric Wilson is Appellant's cousin. Eric testified he was with Appellant and Rico on March 13--14, 2012, and when they were not looking for employment, he and Appellant were drinking and getting high on drugs. Appellant stayed at Eric's apartment the evening of March 14 through the morning of March 15. Eric testified that he and Appellant began using drugs early in the morning on March 15 and Appellant continued drinking and using drugs throughout the afternoon and evening hours of March 15. According to Eric, Appellant left around 3:00 or 4:00 a.m. on March 16--just hours before the murder.

¶49 Prior to this testimony, defense counsel stated her intent during an in camera hearing to ask Rico and Eric on direct whether Appellant expressed any desire to harm the victim or otherwise expressed concern about getting a text message from her. Defense counsel argued that, with this testimony, she wanted to elicit that Appellant did not make or express any threats towards the victim during the five day period Rico and Eric reported being with Appellant. This was to be part of defense counsel's strategy to counter the State's motive evidence relating to the text message. The prosecutor objected on grounds that any such testimony would be inadmissible self-serving hearsay. The trial court sustained the prosecutor's objection and ruled she would not allow this type of testimony. Rico and Eric testified the next day.

¶50 Now on appeal, Appellant claims the trial court violated his rights to a fundamentally fair trial and to present a defense with this ruling. Appellant argues the State "was allowed to take an isolated text message and build an entire case around it[ ]" whereas the defense was prohibited from challenging that evidence.

¶51 We review the district court's evidentiary rulings for abuse of discretion. Cuesta-Rodriguez v. State, 2010 OK CR 23, ¶ 14, 241 P.3d 214, 224. Notably, Appellant did not raise the trial court's earlier ruling when either witness testified the next day at trial. Nor did Appellant make an offer of proof to the judge concerning what testimony he wanted to present. "After a motion in limine is sustained, the party seeking to introduce the evidence must make an offer of proof at trial. This affords the trial court an opportunity to make a final ruling on the evidence." Id., 2010 OK CR 23, ¶ 86, 241 P.3d at 240 (internal citations omitted). Failure to follow this procedure on a motion in limine waives review on appeal of all but plain error. Id.

¶52 Appellant fails to show plain error. The rules of evidence may not be used to arbitrarily impinge on the defendant's right to present competent evidence in his defense. Pavatt v. State, 2007 OK CR 19, ¶ 42, 159 P.3d 272, 286 (citing Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 1049, 35 L. Ed. 2d 297 (1973)). However, "[w]hether Appellant was denied the right to present a defense ultimately turns on whether the evidence at his disposal was admissible." Id., 2007 OK CR 19, ¶ 45, 159 P.3d at 287.

¶53 Assuming arguendo the trial court abused its discretion in disallowing this particular evidence, Appellant fails to show plain error. We have held:

To establish a violation of . . . due process, a defendant must show a denial of fundamental fairness. . . . It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial. Evidence is material if its suppression might have affected the outcome. In other words, material evidence is that which is exculpatory--evidence that if admitted would create reasonable doubt that did not exist without the evidence.

Primeaux, 2004 OK CR 16, ¶ 49, 88 P.3d at 903-04 (quoting Ellis v. Mullin, 326 F.3d 1122, 1128 (10th Cir. 2002)). In the present case, Appellant's proposed evidence (we assume arguendo Eric and Rico would have testified that Appellant had no reaction to the text message or simply did not mention it and that he did not threaten the victim) would at best call into question the State's theory of the motive for the murder. However, it does not refute the overwhelming evidence presented showing Appellant's guilt for Tia Bloomer's murder, including the surveillance tape showing him repeatedly stabbing the victim; eyewitness testimony describing this attack and the efforts needed to stop Appellant's attack; testimony concerning the victim's injuries; and Appellant's videotaped interview describing how he came to be in the bus station with a knife that morning along with his confession to repeatedly stabbing Tia and the reasons why--namely, his sad mental state upon their breakup as a couple. The defense was able to elicit considerable evidence from Eric and Rico regarding Appellant's extended drug binge over the five day time span leading up to the murder. Rico testified concerning Appellant's emotional condition over the loss of his relationship with the victim. Eric described Appellant's relationship with Tia the week before the murder as "off and on" and "they just always have been off and on."

¶54 We fail to see how the additional evidence championed on appeal might have affected the outcome of the first stage, let alone called into question the State's considerable evidence showing malice aforethought. 21 O.S.2011, § 701.7(A) ("Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof."). "Premeditation sufficient to constitute murder may be formed in an instant or it may be formed instantaneously as the killing is being committed." Davis, 2011 OK CR 29, ¶ 76, 268 P.3d at 111. The jury too may rely upon circumstantial evidence to ascertain a person's intent at the time of the homicidal act. Id. In this sense, it matters little for first stage purposes whether the motive behind Appellant's murder of the victim was his deep sadness over the end of the relationship or, instead, was an effort to stop Tia from identifying him to police as her attacker during the previous assault. The overwhelming evidence at trial shows the killing was committed with malice aforethought as alleged by the State even if the jury found the State's theory of motive unpersuasive. Thus, under the total circumstances, Appellant fails to show he was deprived of a fundamentally fair trial through the denial of critical defense evidence during the guilt stage of his trial. Appellant therefore fails to show a plain or obvious error affecting his substantial rights. Proposition IV is denied.

¶55 In Proposition V, Appellant challenges the admission of what he describes as "numerous gruesome photographs" during guilt stage. Specifically, Appellant challenges State's Exhibits 21--36, 41--49 and 51. Appellant argues these photographs were unnecessary because there was no dispute that he stabbed the victim to death. Appellant argues these photographs "serve[d] no legitimate purpose other than to inflame the passion of the jury." Appellant tells us the photographs were more prejudicial than probative, unduly gruesome and cumulative, and deprived him of a fair and reliable trial and sentencing proceeding.

¶56 We review the trial court's admission of photographic evidence for an abuse of discretion. Photographic exhibits are subject to the same relevancy and unfair prejudice analysis as any other piece of evidence. 12 O.S.2011, §§ 2401-2403. As we have held:

Photographs may be probative of the nature and location of wounds; may corroborate the testimony of witnesses, including the medical examiner; and may show the nature of the crime scene. Gruesome crimes make for gruesome photographs, but the issue is whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or needless presentation of cumulative evidence.

Martinez v. State, 2016 OK CR 3, ¶ 46, 371 P.3d 1100, 1112-13, cert. denied, __U.S.__, 137 S. Ct. 386, 196 L. Ed. 2d 304 (2016) (internal citations omitted).

¶57 Appellant's challenge to State's Exhibits 21--26, which he describes as photographs of the victim's bloody clothes, is procedurally defective and does not comply with our Rules. Appellant fails to provide citations to the record showing where these particular photographs were admitted into evidence. These photographs are not referenced on any of the transcript pages cited by Appellant in this claim. Hence, this aspect of his Proposition V claim is waived from appellate review. Rule 3.5(A)(5), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2018); Logsdon v. State, 2010 OK CR 7, ¶ 41, 231 P.3d 1156, 1169-70.

¶58 State's Exhibit 27 depicts the victim's face showing the redness and heavy congestion in the victim's eyes observed by the medical examiner during the autopsy. Appellant preserved his objection to this photograph by making a contemporaneous objection which the trial court overruled.

¶59 State's Exhibits 28--36 depict close-up views of the various stab wounds to the victim's head, neck, back, torso and right hand. Appellant registered a contemporaneous objection to these photographs at trial but cited only his previously-stated objections. The trial court overruled this objection. From the record presented, we cannot ascertain whether Appellant even objected to these particular photographs during the in camera hearing, let alone what grounds may have been asserted.[5] Appellant has therefore waived all but plain error review of State's Exhibits 28--36. Simpson v. State, 1994 OK CR 40, ¶ 2, 876 P.2d 690, 693 (failure to object with specificity to errors alleged to have occurred at trial waives review on appeal of all but plain error).

¶60 Appellant challenges too State's Exhibits 41--46. Although neither party seems to notice, the record shows State's Exhibits 44 and 45 were not published to the jury and ultimately were withdrawn by the prosecutor at the conclusion of the medical examiner's testimony. State's Exhibits 41, 42, 43 and 46 depict an overview of the constellation of injuries observed by the medical examiner on the right side of the victim's head and neck, the right side of her throat and jaw, her upper back and neck as well as to the right side of her body. Appellant objected to these photographs, thus preserving these challenges for appeal.

¶61 State's Exhibits 47 and 48 are photographs depicting the directionality of the victim's stab wounds using wooden Q-tip applicators placed inside each wound. State's Exhibit 49 is a photograph of the victim's hand with a thin metal probe inserted to depict the directionality of the stab wound through the full thickness of the hand. Defense counsel objected to these photographs, thus preserving these challenges for our review.

¶62 State's Exhibit 51 depicts an extracted portion of the ribs from the victim's right side showing where the knife passed and cut through the ribs. Appellant also objected to this photograph, thus preserving this claim for appellate review.

¶63 We find no abuse of discretion from the trial court's admission of these photographs. The photographs depicted the victim's injuries, illustrated the testimony of the medical examiner, and demonstrated the directionality of the various stab wounds. The photographs were relevant to numerous trial issues in the case including, most notably, proving deliberate intent to kill and, during penalty phase, conscious physical suffering to show the murder was especially heinous, atrocious or cruel. See Proposition XIII. These photographs were not unfairly prejudicial considered both individually and collectively. Nor were they cumulative. "[T]he State was not required to downplay the violence involved or its repercussions." Jones v. State, 2009 OK CR 1, ¶ 57, 201 P.3d 869, 885.

¶64 Appellant fails to show error from the admission of any of these photographs (or, for that matter, plain error in those instances where Appellant did not preserve his claim below). Moreover, under the total circumstances, Appellant fails to show he was denied a fundamentally fair trial in violation of due process during either stage of his capital murder trial based on the admission of these photographs. Relief is thus denied for Proposition V.

JURY INSTRUCTIONS

¶65 In Proposition VI, Appellant complains that the trial court violated his due process rights by failing to instruct the jury on the lesser included offenses of second degree depraved mind murder and first degree heat of passion manslaughter. In Proposition VII, Appellant complains that the trial court erred in failing to give voluntary intoxication instructions.

¶66 Appellant requested lesser-included offense instructions on second degree murder and first degree manslaughter at trial, thus preserving these issues for appellate review. The trial court overruled these requests and provided no lesser included offense instructions. "This Court has held that it is the duty of the trial court to determine as a matter of law whether the evidence is sufficient to justify the submission of instructions on a lesser included offense. If there is a doubt, the court should submit the matter to the jury." Rumbo v. State, 1988 OK CR 27, ¶ 3, 750 P.2d 1132, 1132. In a first degree murder case, the trial court should instruct on any lesser form of homicide supported by the evidence. Bland v. State, 2000 OK CR 11, ¶ 54, 4 P.3d 702, 719. We require prima facie evidence of the lesser included offense to support giving a lesser included instruction. Davis, 2011 OK CR 29, ¶ 101, 268 P.3d at 116. "Prima facie evidence of a lesser included offense is that evidence which would allow a jury rationally to find the accused guilty of the lesser offense and acquit him of the greater." Id.

¶67 In capital cases, the Supreme Court has held that a death sentence may not constitutionally be imposed unless the jury is permitted to consider a verdict of guilt as to a lesser-included non-capital offense which is supported by the evidence. Beck v. Alabama, 447 U.S. 625, 633-45, 100 S. Ct. 2382, 2387-94, 65 L. Ed. 2d 392 (1980). See Davis, 2011 OK CR 29, ¶ 117, 268 P.3d at 119. Beck does not, however, require the trial court to instruct on offenses that are not lesser included offenses of the charged offense under state law. Hopkins v. Reeves, 524 U.S. 88, 90-91, 118 S. Ct. 1895, 1898, 141 L. Ed. 2d 76 (1998). The Court's "fundamental concern" in Beck "was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." Schad v. Arizona, 501 U.S. 624, 646, 111 S. Ct. 2491, 2504, 115 L. Ed. 2d 555 (1991).

¶68 Homicide is murder in the second degree "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]" 21 O.S.2011, § 701.8. The record fails to contain any evidence showing Appellant acted without any premeditated design to effect death. Appellant stabbed the victim seven (7) times in the head, neck, back, torso and hand. Numerous superficial cuts too were observed on the victim's head and neck and were consistent with having been made by a serrated blade.

¶69 In his videotaped interview, Appellant admitted grabbing the victim, holding on to her and stabbing her repeatedly. Appellant was separated from the victim only when a security guard sprayed him in the face with pepper spray. Appellant said that he brought the kitchen knife from home so that if he saw Tia, he could stab her. Appellant said too that he and Tia had been arguing about his support of their child and that the relationship between them recently ended. Appellant admitted being angry and depressed when he stabbed the victim. "Nothing in these facts suggests anything but a design to effect the death of one specific person." Charm v. State, 1996 OK CR 40, ¶ 10, 924 P.2d 754, 760. All things considered, there was insufficient evidence presented to allow a jury rationally to find the accused guilty of second degree depraved mind murder and acquit him of first degree malice aforethought murder. See Boyd v. State, 1992 OK CR 40, ¶¶ 5, 11, 839 P.2d 1363, 1366, 1367.

¶70 Appellant's claimed entitlement to instructions on first degree heat of passion manslaughter also lacks merit. Under Oklahoma law, homicide is manslaughter in the first degree "[w]hen perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide." 21 O.S.2011, § 711(2). "The elements of heat of passion are 1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage or resentment; 3) homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool; and 4) a causal connection between the provocation, passion and homicide." Cipriano v. State, 2001 OK CR 25, ¶ 16, 32 P.3d 869, 874. "The question is whether, in addition to evidence of intent, there was evidence that Appellant killed the deceased with adequate provocation, in a heat of passion, without the design to effect death." Id.

¶71 The evidence presented at trial was insufficient to show adequate provocation. The evidence shows that when Appellant confronted the victim in the bus station, she told him simply to leave her alone. At that point, Appellant began stabbing the victim. This is insufficient evidence to show adequate provocation. See Washington v. State, 1999 OK CR 22, ¶ 13 n.4, 989 P.2d 960, 968 n.4 ("Mere words alone, or threats, menaces, or gestures alone, however offensive or insulting, do not constitute adequate provocation."); Grindstaff v. State, 1946 OK CR 12, 82 Okl. Cr. 31, 40, 165 P.2d 846, 850 ("mere words or threats, however opprobrious or violent, constitute in law no adequate provocation for passion such as will reduce a homicide from murder to manslaughter."). See also Jones v. State, 2006 OK CR 17, ¶ 7 n.4, 134 P.3d 150, 154 n.4 ("Adequate provocation requires personal violence by the deceased likely to cause pain, bloodshed or bodily harm."); OUJI-CR (2d) 4-98 (definition of adequate provocation).[6]

¶72 Additionally, as discussed earlier, there was insufficient record evidence showing Appellant killed the victim with no design to effect death. Rather, the evidence uniformly showed Appellant killed the victim with malice aforethought, i.e., the deliberate intention to take away the life of a human being. 21 O.S.Supp.2012, § 701.7(A). Lesser-included instructions on first degree heat of passion manslaughter were thus unwarranted. Black, 2001 OK CR 5, ¶ 48, 21 P.3d at 1066 ("the Oklahoma definitions of malice and heat of passion show they cannot co-exist[.]"). All things considered, insufficient evidence was presented to support instructions on first degree heat of passion manslaughter. Proposition VI is denied.

¶73 In Proposition VII, Appellant complains that the trial court's failure to instruct on voluntary intoxication was reversible error. We review a trial court's refusal to instruct on the defense of voluntary intoxication for abuse of discretion. Cuesta-Rodriguez, 2010 OK CR 23, ¶ 11, 241 P.3d at 223. Appellant requested an instruction on voluntary intoxication and, after an extended discussion, the trial court denied this request. He has therefore preserved this claim for our review.

¶74 "Before a voluntary intoxication instruction is given, the evidence must be sufficient to establish a prima facie case that the defendant was intoxicated to the point he was unable to form deliberate intent to kill." Id., 2010 OK CR 23, ¶ 11, 241 P.3d at 223. We have held that:

Prima facie evidence is evidence that is "good and sufficient on its face," i.e., "sufficient to establish a given fact, or the group or chain of facts constituting the defendant's claim or defense, and which if not rebutted or contradicted, will remain sufficient to sustain a judgment in favor of the issue which it supports." Black's Law Dictionary 1190 (6th ed. 1990); Ball v. State, 2007 OK CR 42, ¶ 29 n.4, 173 P.3d 81, 90 n.4. Under our law, the requirements for establishing a voluntary intoxication defense are: (1) the defendant was intoxicated; and (2) he was "so utterly intoxicated, that his mental powers [were] overcome, rendering it impossible for [him] to form the specific criminal intent . . . element of the crime" (emphasis added). Simpson v. State, 2010 OK CR 6, ¶ 28, 230 P.3d 888, 899; see also McElmurry v. State, 2002 OK CR 40, ¶ 72, 60 P.3d 4, 23.

Cuesta-Rodriguez v. State, 2011 OK CR 4, ¶ 7, 247 P.3d 1192, 1195 (denying rehearing).

¶75 The closest evidence in this case of Appellant's purported intoxication at the time of the murder was from Eric Wilson. Eric testified that starting at 9:00 p.m. on March 15, he and Appellant were drinking gin at Eric's apartment. Eric testified Appellant drank "a lot" of gin that night. Eric testified that he and Appellant stayed up into the early morning hours of March 16 snorting powder cocaine and drinking beer. Eric testified that he did not see Appellant using PCP at any point. Eric last saw Appellant around 3:00 or 4:00 a.m. on March 16 when Appellant left.[7]

¶76 In his videotaped interview, Appellant did not indicate that he was under the influence of anything when he murdered the victim. Instead, Appellant calmly described his reason for stabbing the victim, i.e., that he was depressed and angry over the breakup. Detective Benavides, who commenced the interview within roughly two hours after Appellant's arrest, did not observe anything in his interactions with Appellant suggesting intoxication. Neither Detective Benavides nor any of the officers at the bus station who interacted with Appellant observed any of the tell-tale signs and behaviors they typically associated with PCP use based on their training and experience. Instead, Appellant was very calm and matter-of-fact. Appellant was able to communicate with the officers at the bus station and, a short time later, with a doctor at the emergency room concerning his injuries. As Detective Benavides reviewed the Miranda warning with Appellant at the beginning of the interview, Appellant followed along, responded to the detective's questions and appeared to understand.

 

¶77 During the videotaped interview, Appellant provided a full account of how he came to be at the bus station and why he stabbed the victim. Appellant is seen on the videotape responding appropriately to Detective Benavides's questions. Appellant gave a detailed description of taking a knife from home with him to the bus station, confronting the victim and then stabbing her repeatedly inside the terminal. Appellant never claimed during the interview that he was high or intoxicated or that drug or alcohol use was somehow responsible for his actions. Instead, Appellant calmly--and at times, tearfully--explained his actions as being fueled by the depression and anger he felt over Tia's termination of their relationship. Appellant asked if the detective would contact his mother, asked about the victim's condition and expressed his belief that he would be killed in jail for what he had done to Tia. Appellant too interacted with the detectives during the interview to facilitate their taking of buccal swabs for later testing.

¶78 We have described the test for obtaining voluntary intoxication instructions as "a high standard whose threshold cannot be met simply by presenting conflicting evidence of a defendant's level of intoxication." Cuesta-Rodriguez, 2011 OK CR 4, ¶ 7, 247 P.3d at 1195. The evidence in this case falls well short of what is required for voluntary intoxication instructions under our law. In this regard, we have held that:

In a case like the current one, where the defendant provides a detailed description of the circumstances and events leading up to and including his own act(s) of killing the victim, the very fact that the defendant was aware of his circumstances and able to recognize what was happening at the time suggests that he will not be able to make even a prima facie showing that he was so intoxicated that it was impossible for him to have formed a specific intent to kill his victim.

Id., 2011 OK CR 4, ¶ 10, 247 P.3d at 1196.

¶79 Here, the evidence shows at best Appellant used drugs and drank gin in the hours leading up to the killing. Nonetheless, Appellant provided a detailed, lucid account of what happened before, during and after the killing of his ex-girlfriend. And his behavior and interaction with the police after being arrested does not suggest intoxication of any kind. Under the total circumstances, an instruction on voluntary intoxication was unwarranted. See Bland, 2000 OK CR 11, ¶ 51, 4 P.3d at 718 (voluntary intoxication instructions unwarranted where, despite evidence showing appellant had ingested drugs the day of the murder, appellant provided a detailed account of the circumstances of the murder in his testimony); Jackson, 1998 OK CR 39, ¶¶ 69-70, 964 P.2d at 892 (voluntary intoxication instructions unwarranted where appellant testified he was aware of things going on around him just before and just after the murder). Proposition VII is denied.

JUROR MISCONDUCT

¶80 In Proposition VIII, Appellant complains that the trial court abused its discretion in failing to remove Juror R.G. for misconduct during the first stage of trial based on her purported discussion of the case with Juror C.E., who was removed. Appellant also complains that the trial court abused its discretion in replacing C.E. with Alternate Juror C.S. as the ninth juror on the panel. Appellant argues the trial court should have replaced C.E. with the other available alternate juror because C.S. too was implicated in the juror misconduct.

¶81 The crux of Appellant's Proposition VIII claim is that "[t]he record shows by clear and convincing evidence that [C.E.] and [R.G.] engaged in a conversation suggesting that they did not believe the defense witnesses who appeared in orange." The bedrock constitutional principle at issue here is Appellant's due process right to "a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751 (1961). See U.S. Const. amends. VI and XIV; Okla. Const. art. 2, § 20. Towards that end, trial judges in Oklahoma are required to instruct jurors "that it is their duty not to converse with, or suffer themselves to be addressed by, any other person, on any subject of the trial, and that it is their duty not to form or express an opinion thereon, until the case is finally submitted to them." 12 O.S.2011, § 581.

¶82 In the present case, the trial court repeatedly admonished the jury not to discuss the case before releasing the jurors for mid-trial and evening recesses. The record shows Marva Banks, an assistant public defender not involved with Appellant's case, informed the trial court on the fifth day of trial that she heard three jurors (two African American males and a woman with blonde hair) the previous evening discussing witness testimony in the parking garage while they were all waiting for the elevator. Banks testified that two jurors were standing in front of her waiting on the elevator in the parking garage when a third juror approached and said "I've never seen so much orange." At that point, the other two jurors started laughing and one said "Yeah, there were so many family members that showed up in orange and it didn't help." Banks said the jurors' reference to "orange" was to jail orange. According to Banks, one of the jurors asked "where was his mother? That would have helped."

¶83 Notably, the last three witnesses before this purported incident were Eric Wilson, Roy Tryon, and Rico Wilson--Appellant's cousin, father and brother respectively. All three of these witnesses were in custody, and wearing orange jail garb, when they took the witness stand. Based on Banks's description of the three jurors, the trial court and parties questioned Juror C.E., Juror R.G. and Alternate Juror C.S. When R.G. was brought in for questioning, Banks stated R.G. was not the female juror involved. R.G. was then returned to the jury room without being questioned. Juror C.E. was brought in next and admitted saying "I couldn't believe there was [sic] so many people in orange coming today." However, C.E. denied saying this on the way to the elevator or in the parking lot. Instead, he claimed to have made this comment upstairs in the courthouse the day before when the jurors were leaving as one of the witnesses in orange was also getting on an elevator to leave. C.E. testified that the man in orange had a "weird" stare.

¶84 When asked by Judge Truong whether, when C.E. left the day before, he rode with anyone in the elevator on the way to his car, C.E. responded that he rode with Juror R.G. C.E. explained that he was waiting at the elevator with R.G. and then rode the elevator up with her and some other people. C.E. denied discussing anything about the case. When asked whether anyone mentioned too many people in orange or said they wished the mother was there, C.E. replied "[n]o, not during there." C.E. then immediately corrected himself and recalled that he "did say I wish the mother would have got up here."

¶85 In follow-up questioning, the prosecutor asked whether C.E. had predetermined the outcome of the case; C.E. said no. When asked to explain what precipitated the comment about people being in orange, C.E. said it was because of the behavior of the person in orange. C.E. acknowledged too that the defense had no burden of proof and had no obligation to present any witnesses. When asked by the defense with whom he was discussing all the orange, C.E. responded "I had just said it out loud . . . I just said that was a lot of orange." When asked whether there was discussion to the effect that all the orange didn't help the client, C.E. denied having any such conversation or ever saying it. However, one of the other jurors--he believed Juror J.L.--in response to his comment about all the orange told him "shh." Additionally, C.E. said he made the comment about wishing they had heard from the mother to Juror R.G. When C.E. made the comment, he said R.G. "just didn't say nothing. She just kind of looked at me and just acknowledged that I said something and that was it." C.E. denied that any other male jurors were present.

¶86 Alternate Juror C.S. did not recall walking the night before with Jurors C.E. and R.G. to the parking garage. C.S. denied saying to the other jurors anything about having made up his mind on the case. Nor had he talked to the other jurors about the case. C.S. also did not remember hearing the other jurors talk about the case. C.S. testified that he had not made up his mind on the case because he had not yet heard all the evidence.

¶87 Banks never identified C.S. as one of the people involved in the conversation with C.E. At the conclusion of C.S.'s testimony, defense counsel stated that Banks thought the other male involved in the conversation may have been Juror Q.A. The prosecutor noted too that Banks gestured in a manner indicating she was not sure it was C.S. when he first entered the room. When Q.A. was questioned, he testified C.E. did walk ahead of him on the way to the parking garage the night before. Q.A. did not, however, hear C.E. talking. Nor had he heard any of the jurors discussing the case or indicating that they had reached a verdict. Q.A. denied doing the same. When asked by defense counsel whether Q.A. heard any of the jurors discussing what they saw yesterday as they were leaving, Q.A. responded that he only saw "some shaking of heads, but no discussion." Q.A. clarified that no one was shaking their heads to each other but only in "self-contemplation" just as some had done when they were sitting in the jury box listening to the testimony. Q.A. clarified no one was talking about the case or deliberating in any way when they were shaking their heads.

¶88 Juror R.G. was the last juror questioned. R.G. denied discussing the case with anyone on the jury. Nor had R.G. heard other jurors talking about the case in her presence. R.G. admitted using the elevators in the parking garage the previous evening but denied hearing anyone talking about orange. R.G. could not remember other jurors being around her as she walked to the parking garage. R.G. explained she "want[s] to leave here as soon as possible when I'm done at the end of the day. I don't look or talk to anybody. I just want to get the heck out of here." R.G. testified the trial had been "very intense" and she "just want[s] to leave" after court each day. Hence, R.G. could not recall who she was with yesterday as she left. Nor did she hear any conversations.

¶89 The parties agreed to remove Juror C.E. based on his violation of the court's admonishment not to talk about the case. The trial court granted that request. C.E. was replaced by Alternate Juror C.S., the first alternate juror. Defense counsel objected because she said Banks thought C.S. looked closer to the man she saw than Juror Q.A. Defense counsel urged that the second alternate juror replace C.E. instead. Defense counsel also requested R.G. be removed from the panel. The trial court overruled Appellant's objection as to C.S. because he heard nothing and had not discussed the case with anyone. The trial court likewise denied Appellant's challenge to R.G., concluding that even if C.E. had been talking to R.G., her testimony makes clear she was not paying any attention. The trial court observed R.G.'s testimony that all she cared about was going home at the time and noted too that there was no evidence C.E. and R.G. had been discussing anything. Unsuccessful in his quest to remove C.S. and R.G., Appellant requested a mistrial which was also denied.

¶90 In Jones v. State, 2006 OK CR 5, 128 P.3d 521, we found no abuse of discretion from the trial court's refusal to remove a juror mid-trial who expressed in the presence of another juror an opinion as to the appropriate punishment. The trial court made inquiry when another juror reported hearing Juror Y say "that they should place him in a box in the ground for what he has done." Id., 2006 OK CR 5, ¶ 19 n.3, 128 P.3d at 535 n.3. This indicated to the reporting juror that Juror Y had already made up his mind on the issue of punishment. Id., 2006 OK CR 5, ¶ 19, 128 P.3d at 535. When questioned by the trial court, Juror Y denied making the statement but then later admitted he "could have said that, yes." Id. Juror Y also admitted having formed a partial opinion on what he thought should be the appropriate punishment but said he was waiting to hear the rest of the evidence. When the reporting juror was questioned again, she indicated hearing only part of the statement and admitted she did not know if it was related to the case. All of the other jurors denied hearing another juror express an opinion as to the appropriate penalty or punishment. The trial court denied defense counsel's request to further question Juror Y and to excuse him for cause. Id.

¶91 We find our previous holding in Jones applies here:

A claim of juror misconduct before a criminal case is submitted to a jury must be established by clear and convincing evidence. Glasgow v. State, 1962 OK CR 41, ¶ 16, 370 P.3d 933, 936; Pennington v. State, 1995 OK CR 79, ¶ 18, 913 P.2d 1356, 1363. Jones must show actual prejudice from any jury misconduct and "defense counsel's mere speculation and surmise is insufficient upon which to cause reversal." Woodruff v. State, 1993 OK CR 7, ¶ 13, 846 P.2d 1124, 1132, quoting Chatham v. State, 1986 OK CR 2, ¶ 7, 712, P.2d 69, 71. The trial court personally observed the jurors and their responses. We will not disturb its refusal to allow additional questioning and/or excuse the allegedly offending juror for misconduct absent an abuse of discretion. Teafatiller v. State, 1987 OK CR 141, ¶ 18, 739 P.2d 1009, 1012. The trial court did not abuse its discretion. Jones has failed to show that any of his alleged misconduct was prejudicial; therefore, this proposition fails.

Id., 2006 OK CR 5, ¶ 20, 128 P.3d at 535.

¶92 In the present case, the trial court excused C.E. in light of his admission that he did not follow the court's admonishment against not talking about the case. However, the trial court did not abuse its discretion in denying Appellant's request to strike C.S. and R.G., or to seat the second alternate instead of C.S. Appellant does little more on appeal than speculate and surmise that these two jurors engaged in misconduct. The record, on the other hand, supports the trial court's findings. Appellant fails to show by clear and convincing evidence these two jurors discussed the case with anyone, let alone had predetermined the case. Considering the deference we must afford the trial court in this context, we defer to the trial court's ruling on these issues. See Jackson v. State, 2006 OK CR 45, ¶ 11, 146 P.3d 1149, 1156 ("Whether a prospective juror is biased depends heavily on the trial court's appraisal of the juror's credibility and demeanor and often the basis for these credibility findings cannot be readily discerned from an appellate record."). The trial court did not abuse its discretion either in refusing to remove C.S. and R.G. or in denying Appellant's related motion for mistrial. The removal of C.E. cured any possible prejudice arising from his admitted misconduct. Knighton v. State, 1996 OK CR 2, ¶¶ 64-65, 912 P.2d 878, 894 (a defense motion for mistrial is left to the court's discretion and is warranted only when an event at trial results in a miscarriage of justice or constitutes an irreparable and substantial violation of a defendant's constitutional or statutory rights). Proposition VIII is denied.

SENTENCING ISSUES

¶93 In Proposition IX, Appellant complains that the trial court impermissibly restricted his presentation of mitigating circumstances. Appellant first challenges the limitations placed on Dr. David Musick's testimony during penalty phase. Dr. Musick, a sociology professor, was presented by the defense as an expert witness to discuss the risk factors and events from Appellant's life history which impacted his development. This was offered to explain Appellant's pattern of illegal behavior culminating in his murder of Tia Bloomer. During this testimony, the trial court sustained a hearsay objection to Dr. Musick's regurgitation on his direct examination of hearsay statements by Appellant's mother concerning Roy Tryon's violent conduct using a knife against one of Sheryl Wilson's boyfriends. This testimony was offered to show the facts relied upon by Dr. Musick in formulating Appellant's life story which, in turn, was used to support his conclusions and opinions. The trial court admonished defense counsel that the witness "cannot testify to what other people told him" in presenting his expert's opinion.

¶94 On appeal, Appellant complains that the trial court's ruling violated his Eighth Amendment right to present relevant mitigating evidence. He also claims that the strict application of state evidence rules to disallow this particular evidence deprived him of due process. Appellant did not raise this claim in connection with the trial court's ruling, thus waiving all but plain error review on appeal. Brown v. State, 2008 OK CR 3, ¶ 11, 177 P.3d 577, 580 (failure to object at trial on grounds raised on appeal waives review of all but plain error). Appellant fails to show plain error.

¶95 "It is beyond dispute that mitigating evidence is critical to the sentencer in a capital case." Warner v. State, 2001 OK CR 11, ¶ 15, 29 P.3d 569, 575. Mitigating evidence is a necessary component of the individualized sentencing required in capital cases. One of the cardinal principles of the Supreme Court's Eighth Amendment jurisprudence is that a capital murder defendant must be given the opportunity to present relevant mitigating evidence for consideration by the jury. Tennard v. Dretke, 542 U.S. 274, 284, 124 S. Ct. 2562, 2570, 159 L. Ed. 2d 384 (2004); Eddings v. Oklahoma, 455 U.S. 104, 113-14, 102 S. Ct. 869, 876-77, 71 L. Ed. 2d 1 (1982). The Eighth Amendment forbids imposition of a death sentence if the jury "is 'precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" Smith v. Spisak, 558 U.S. 139, 144, 130 S. Ct. 676, 681-82, 175 L. Ed. 2d 595 (2010) (quoting Mills v. Maryland, 486 U.S. 367, 374, 108 S. Ct. 1860, 1865, 100 L. Ed. 2d 384 (1988)).

¶96 The trial court's ruling was based on state law, specifically, Title 12 O.S.Supp.2013, § 2703 and 12 O.S.2011, § 2705. Section 2703 provides that an expert witness may base an opinion on inadmissible facts or data so long as such facts or data are of the type reasonably relied upon by experts in the witness's field of expertise.[8] "Under this rule, an expert may base an opinion solely on inadmissible hearsay." Cuesta-Rodriguez, 2010 OK CR 23, ¶ 39, 241 P.3d at 229. We have previously held that an expert witness may, consistent with 12 O.S.2011, § 2705, generally disclose on direct examination the facts or data underlying his opinion. Id.[9] We found that "[t]he only limit placed on the disclosure of such information by this Court is that section 2705 cannot be used as 'a license to parade a mass of inadmissible evidence before the jury.'" Lewis v. State, 1998 OK CR 24, ¶ 19, 970 P.2d 1158, 1166-67 (quoting Sellers v. State, 1991 OK CR 41, ¶ 23, 809 P.2d 676, 685). However, since these decisions, the Legislature has amended Section 2703 to add that facts or data otherwise inadmissible "shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." 12 O.S.Supp.2013, § 2703. This amended version of Section 2703 was in force during Appellant's trial.

¶97 The trial court's limitation of Dr. Musick's testimony was driven by the compelling state interest of preventing a party from using an expert witness as a mere conduit to regurgitate large amounts of inadmissible and possibly unreliable hearsay. Appellant argues it was impossible for him to present a full social history to the jury in light of the trial court's limitation. The record, however, does not support this assertion. Appellant presented numerous first-hand accounts from several relatives and family members--including Sheryl Wilson and Roy Tryon--concerning the physical abuse and violence Roy inflicted on Appellant, Sheryl and Appellant's siblings as well as the turbulent, drug-fueled nature of Roy and Sheryl's relationship. Indeed, Roy admitted in his testimony to stabbing in front of the children a man whom he believed was Sheryl's boyfriend. Appellant presented mitigation evidence from the family witnesses concerning virtually every aspect of his life. This included first-hand accounts concerning Appellant's drug abuse; learning disabilities; educational background; prior incarcerations; prior head injuries; suicide attempts; family background; mental health treatment and institutionalization; prior incarcerations of his mother, father and siblings; gang involvement; the crowded conditions at the family home; the fact the family constantly moved; the non-stop drug activity at the family home; the routine absence of Appellant's mother from the family home while on multi-day drug binges; Appellant's mother buying drugs from Appellant and his brother; Sheryl's physical abuse of her children; Appellant's drug dealing; Appellant's love for his son; the nature of Appellant's relationship with the victim; and the nature of Appellant's relationship with his mother.

¶98 Dr. Musick's expert testimony was based in large part on the same first-hand accounts relayed through Appellant's family witnesses during penalty phase testimony. To be sure, Dr. Musick's opinions and conclusions were subject to extensive cross-examination and impeachment by the prosecutor, but we fail to see how this fact undermined Appellant's Eighth Amendment right to present relevant mitigating evidence--particularly in light of the large amount of mitigating evidence Appellant presented about every aspect of his life. Under these circumstances, Appellant was not deprived of his Eighth Amendment right to present relevant mitigating evidence based on the trial court's hearsay ruling. At best, the effect of the trial court's ruling was to disallow cumulative accounts by the expert witness that would needlessly prolong the trial. This was well within the trial court's discretion under the governing law. See Postelle v. State, 2011 OK CR 30, ¶ 74, 267 P.3d 114, 142. This aspect of Proposition IX is denied as there is no plain or obvious error affecting Appellant's substantial rights based on the trial court's ruling.

¶99 Appellant's complaint that the trial court violated his Eighth Amendment rights by disallowing mitigation testimony from Pamela Wilson, Appellant's aunt, concerning domestic violence between Appellant's parents which occurred before Appellant was born also lacks merit. In the challenged passage, Pamela Wilson testified on direct examination to the controlling nature of the relationship between Sheryl Wilson and Roy Tryon. When defense counsel asked whether Roy had ever become physical with Sheryl, the prosecutor asked to approach and a bench conference ensued. The prosecutor objected to the form of the question, arguing the question would allow testimony about incidents of domestic abuse between the couple which occurred before Appellant was born. The prosecutor urged that the defense be required to limit its inquiry to those instances of domestic violence which Appellant personally observed because "this is a trial about [Appellant] not about Roy and Sheryl's relationship. So it's only relevant if somehow that behavior morphed or shaped who [Appellant] is." Defense counsel responded that she was eliciting testimony showing "the foundation of when the behavior began, which does impact him, and how long it had began and how long it has happened". The trial court sustained the prosecutor's objection and directed defense counsel to limit her inquiry to those incidents of domestic violence witnessed by both the witness and Appellant. Wilson went on in her testimony to describe incidents of domestic abuse which occurred in front of Appellant and his siblings, thus conforming to the ruling.

¶100 During Sheryl Wilson's direct examination, the trial court sustained a similar objection to testimony concerning certain instances of domestic abuse between Roy and Sheryl. In this instance, Wilson acknowledged that the domestic violence she was asked to describe was nothing Appellant "knew much about". The trial court later sustained a challenge to testimony from Wilson concerning her drug use before Appellant was born.

¶101 Appellant complains on appeal that the trial court violated his Eighth Amendment right to present relevant mitigation evidence with these rulings. Appellant did not make these arguments in connection with the trial court's ruling, thus waiving all but plain error. Moreover, the trial court did not abuse its discretion in limiting the mitigation testimony. As discussed earlier, Appellant has a constitutional right to present relevant mitigation evidence during his capital sentencing hearing. Drawing on the general relevancy standard for the admission of evidence, the Supreme Court has held that "[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Tennard, 542 U.S. at 284, 124 S. Ct. at 2570 (internal quotation omitted). Thus, the state cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." Id., 542 U.S. at 285, 124 S. Ct. at 2570 (internal quotation omitted).

¶102 The trial court did not bar the admission of evidence the sentencer could reasonably find warranted a sentence less than death. The disallowed testimony was not relevant because it described incidents of domestic violence Appellant did not witness and that did not affect his development. This testimony, along with the specifics of Sheryl Wilson's drug use prior to Appellant's birth, was not evidence of Appellant's character or record and any of the circumstances of the offense. Moreover, defense counsel elicited from the various family members extensive testimony concerning the domestic abuse Appellant witnessed as a child as well as the dynamics of his parents' relationship. Defense counsel too elicited a great deal of testimony concerning Sheryl Wilson's drug use, including evidence concerning the drugs she ingested while pregnant with Appellant. The trial court appropriately limited the witness's testimony with the challenged rulings. There was no plain or obvious error affecting Appellant's substantial rights from the trial court's ruling. Proposition IX is denied.

¶103 In Proposition X, Appellant complains that capital punishment for "brain damaged and chronically mentally ill defendants" like himself violates the Eighth Amendment. In urging a categorical exception from the death penalty for those whom he describes as "severely mentally ill," Appellant compares his situation to mentally retarded inmates who are ineligible for execution under Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). Appellant argues too that mental illness "is often misunderstood" by juries who "might believe, wrongly, that mental illness necessarily implies violence." This, in turn, means "a mentally ill defendant cannot adequately wage a mitigation case." And because evidence of mental illness is "often not well received by jurors" this fact calls into question the ability of a capital sentencer to adequately conduct the individualized sentencing determination required by the Eighth Amendment. For these reasons, Appellant tells us a categorical exception is needed.

¶104 We have previously rejected this claim and do so here. Underwood v. State, 2011 OK CR 12, ¶ 69, 252 P.3d 221, 248. In the present case, Appellant presented expert testimony that he was low functioning and suffered both from mental illness (most prominently depression) and brain damage. Appellant presented this testimony along with anecdotal evidence from family members concerning his cognitive and developmental limitations, his mental health treatment and his experience taking--then discontinuing--medications prescribed specifically for his mental issues.

¶105 Appellant did not assert an insanity defense at trial or otherwise show that he suffered diminished capacity to understand the nature of his conduct at the time of the crime. Appellant calmly described for police during the videotaped interview a few hours after the murder how, and why, he repeatedly stabbed the victim. Appellant's neuropsychological expert, Dr. John Fabian, testified Appellant was not mentally retarded. And there is no evidence suggesting mental illness prevents Appellant from comprehending the reasons for the death penalty in this case or its implications. Ford v. Wainwright, 477 U.S. 399, 417, 106 S. Ct. 2595, 2606, 91 L Ed. 2d 335 (1986). Defense counsel presented evidence of Appellant's mental issues as mitigating circumstances for the jury's consideration during penalty phase. Here, the jury rejected this evidence as a basis for imposing a non-capital punishment.

¶106 We decline Appellant's invitation to hold that mentally ill persons are categorically ineligible for the death penalty. Appellant provides no workable standard to implement such a rule and one is not readily apparent considering the various forms of mental illness and their varying effects on different individuals. We reject too Appellant's suggestion that he was somehow unable to mount an adequate penalty-phase defense because of the so-called "double-edged" nature of mental health evidence. In the present case, the jury was adequately instructed on the consideration of mitigating circumstances and was presented a plethora of mitigation evidence by the defense to consider in determining the appropriate sentence for Appellant's crime. The value and worth of this evidence was ultimately for the jury to decide. "Despite evidence that Appellant suffers from . . . mental illness, we accept the jury's conclusion that he was morally culpable for his actions and deserving of the death penalty." Underwood, 2011 OK CR 12, ¶ 69, 252 P.3d at 248. Proposition X is denied.

¶107 In Proposition XI, Appellant complains that his prior felony conviction was improperly used to support three (3) separate aggravating circumstances. This, Appellant argues, violated the Eighth Amendment requirement that aggravators narrow the class of persons eligible for the death penalty. Appellant complains too that using the same evidence to support three separate aggravating circumstances skews the weighing process and creates the risk that the death penalty will be imposed arbitrarily.

¶108 Appellant did not raise this claim below, thus waiving all but plain error. Appellant fails to show error, plain or otherwise. In the present case the State introduced by stipulation State's Exhibits 60 and 61, a judgment and sentence and docket sheet for Appellant's convictions on four (4) counts of Assault with a Dangerous Weapon in 2011. According to the judgment and sentence, Appellant received a ten (10) year suspended sentence on each count. These convictions were for Appellant's act of shooting at several people in a hotel parking lot. Evidence of the facts surrounding these crimes was independently presented from the police officer who witnessed the shooting. Evidence of Appellant's prior felony convictions was introduced by the State to support the aggravating circumstances that the murder was committed by a person while serving a sentence of imprisonment on a conviction of a felony; and the defendant was previously convicted of a felony involving the use or threat of violence to the person. Appellant's prior felony convictions were also relevant to show future dangerousness and, thus, the aggravating circumstance of the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. See Lockett v. State, 2002 OK CR 30, ¶ 32, 53 P.3d 418, 428 (prior felony convictions indicating likelihood of future violence may be offered to show continuing threat aggravator).

¶109 This Court has reviewed claims of unconstitutionally duplicitous aggravating circumstances in the past. We have rejected the claim that use of a prior conviction to support both the prior violent felony and continuing threat aggravators constituted error. We reasoned that the same evidence, a prior felony conviction, may be used to support these two aggravators so long as the prior conviction covers different aspects of the defendant's conduct. Hammon v. State, 2000 OK CR 7, ¶¶ 85-86, 999 P.2d 1082, 1100; Berget v. State, 1991 OK CR 121, ¶¶ 47-52, 824 P.2d 364, 376-77. We found that each aggravator covered separate and distinct aspects of the defendant's conduct, i.e., his past violent felony convictions versus the probability of committing violent acts in the future from which society would need protection. Hammon, 2000 OK CR 7, ¶ 86, 999 P.2d at 1100.

¶110 In light of these decisions, we reject Appellant's challenge to the prior violent felony aggravator and the continuing threat aggravating circumstances on grounds they are impermissibly duplicitous. Both aggravators focus on different aspects of Appellant's conduct "and one can be found without necessarily finding the others[.]" Cannon v. State, 1998 OK CR 28, ¶ 57, 961 P.2d 838, 853. Appellant fails to show a plain or obvious error affecting his substantial rights. Thus, there is no error, plain or otherwise. To the extent Appellant bases his duplicity challenge on the serving a sentence of imprisonment aggravator, this aspect of his Proposition XI claim is moot. We strike this particular aggravating circumstance in the next proposition of error and conduct reweighing in connection with our mandatory sentence review. Proposition XI is therefore denied.

¶111 In Proposition XII, Appellant complains that application of the serving a sentence of imprisonment aggravator in his case renders the aggravator unconstitutionally overbroad because he was not physically incarcerated when he committed the murder. Rather, Appellant says, he had never been to prison and was merely serving a probated sentence while serving out the suspended sentence for his prior felony convictions.

¶112 The jury found that Appellant murdered Tia Bloomer while he was "serving a sentence of imprisonment on conviction of a felony." 21 O.S.2011, § 701.12(6). In Oklahoma, a suspended felony sentence represents a felony conviction in which execution of the defendant's sentence of imprisonment is suspended in whole or part, with or without probation. 22 O.S.2011, § 991a(A)(1). When the defendant is subject to probation in this context, the sentence of imprisonment is suspended based on the defendant's compliance with special terms and conditions of probation imposed by the judgment and sentence. Marutzky v. State, 1973 OK CR 398, ¶ 5, 514 P.2d 430, 431. Probation "is a procedure by which a defendant found guilty of a crime . . . is released by the court subject to conditions imposed by the court and subject to supervision by the Department of Corrections, a private supervision provider or other person designated by the Court." 22 O.S.Supp.2014, § 991a(E).[10] We have held that a suspended sentence is a matter of grace. Demry v. State, 1999 OK CR 31, ¶ 12, 986 P.2d 1145, 1147. "Until that suspended sentence has been fully served, a defendant remains under the jurisdiction of the trial court with the sentence subject to revocation." Id.

¶113 "[A] judgment and sentence where execution of all or a portion of the assessed sentence is suspended is a conviction." Grimes v. State, 2011 OK CR 16, ¶ 16, 251 P.3d 749, 754. When the State files an application to revoke, the issue is whether the suspended sentence previously imposed should be executed and the court makes a factual determination as to whether or not the terms of the suspension order have been violated. Id., 2011 OK CR 16, ¶ 13, 251 P.3d at 754. See also Friday v. State, 2016 OK CR 16, ¶ 5, 387 P.3d 928, 930 ("An order revoking a suspended sentence is not a conviction or sentence, but is instead the revocation of a condition placed upon the execution of a sentence."). During the time span of the suspended sentence, the defendant "is obligated to abide by the terms and conditions of his probation or face revocation of the unexecuted portion of his sentence. The unexecuted portion of the sentence consists of any time during that . . . [time] span not spent in custody." Grimes, 2011 OK CR 16, ¶ 10, 251 P.3d at 753.

¶114 In the present case, the judgment and sentence document introduced to prove Appellant's prior felony conviction shows he was serving a ten year sentence of imprisonment under the custody and control of the Department of Corrections--all suspended and subject to special terms and conditions of probation. A supplemental order attached to the judgment and sentence shows Appellant was subject to supervised probation for the first two (2) years of his ten year suspended sentence through the Oklahoma County District Attorney's Office. The supplemental order too contained the rules and conditions of probation to which Appellant was subject along with a few special conditions like attending domestic abuse counseling and obtaining a drug/alcohol assessment.

¶115 We have consistently rejected claims that the serving a sentence of imprisonment aggravator is limited to cases where the murder occurs in a prison facility. Humphreys v. State, 1997 OK CR 59, ¶ 31, 947 P.2d 565, 575 (citing cases). We have upheld this aggravator for murders committed by parolees. We reasoned that parole is "a 'significant restraint' on the liberty of the parolee who is subject to control of the parole board 'under the cloud of an unexpired sentence.'" Cleary v. State, 1997 OK CR 35, ¶ 42, 942 P.2d 736, 747 (quoting Plotner v. State, 1986 OK CR 97, ¶ 3, 721 P.2d 810, 811-12). See 57 O.S.2011, § 512 (setting forth the conditions for release of inmates in state penal institutions who are granted parole). We observed too that "[a] sentence which is unexpired obviously is being served." Cleary, 1997 OK CR 35, ¶ 42, 942 P.2d at 747.

¶116 We have also approved of the application of this aggravator to situations "when the killing occurred within an Oklahoma prison facility, when the murder was committed by an inmate who had escaped and when the killing was committed by an inmate participating in the Pre-parole Conditional Supervision Program." Humphreys, 1997 OK CR 59, ¶ 31, 947 P.3d at 576. We have upheld this aggravator too when the killing was committed by inmates participating in the house arrest program. Id. We reasoned that inmates serving under house arrest, like those in the pre-parole supervision program, "remain within the custody of the Department of Corrections and continue to serve their sentences while participating in them[.]" Id.

¶117 We have found no prior cases in which this Court has upheld the application of the serving a sentence of imprisonment aggravator when the murder was committed by a defendant serving a suspended sentence on a felony. The difference between the present case and those previous situations where this aggravator has been approved is that Appellant's ten year sentence of imprisonment was not executed prior to Tia Bloomer's murder. That is because Appellant's sentence of imprisonment was suspended. Appellant thus was not serving a sentence of imprisonment when he stabbed Tia Bloomer but, rather, was serving a suspended sentence of imprisonment while on probation. Appellant's situation is therefore far different from a parolee who "was serving a sentence, albeit on parole," Harmon, 2011 OK CR 6, ¶ 73, 248 P.3d at 942, an escapee who physically absented himself from DOC custody, or any of the other forms of supervised release in which we have approved the use of this aggravator. In those cases, the defendant committed capital murder while serving an unexpired sentence of imprisonment that had actually been executed.

¶118 The State argues Appellant was "under the custody and control of the Department of Corrections" when he stabbed the victim based on similar language contained within the judgment and sentence document. The judgment and sentence, however, makes clear that Appellant's ten year sentence of imprisonment was suspended on condition that Appellant follow the rules and conditions of probation contained within the supplemental order. Moreover, Appellant was not even being supervised by the Department of Corrections when he stabbed the victim. He was being supervised by the Oklahoma County District Attorney's Office and, at that, for a mere fraction (two years) of the ten year suspended sentence imposed. We therefore think the State's comparison of Appellant's supervised two-year probation to that of an inmate serving out the balance of his or her unexpired sentence of imprisonment through parole or some other form of early release to be misguided. The record makes clear Appellant's sentence of imprisonment was never executed and that he was never in DOC custody on the suspended sentence.

¶119 The difference between a suspended sentence of imprisonment and an actual sentence of imprisonment is stark when one considers the significance of an order revoking a suspended sentence. If the trial court finds a defendant violated the rules and conditions of his probation, the court may execute the entire unexecuted portion of the defendant's sentence until the expiration of the original term of sentence. 22 O.S.2011, § 991b; Grimes, 2011 OK CR 16, ¶ 10, 251 P.3d at 753; Hemphill v. State, 1998 OK CR 7, ¶ 9, 954 P.2d 148, 151. That means had Appellant's sentencing judge found a violation by Appellant of his rules and conditions of probation, the court would have been authorized to revoke Appellant's ten year sentence in whole, thus resulting in Appellant's subsequent service of ten full years in confinement. The reason why is clear: Appellant was serving a suspended, probated sentence of imprisonment that had not yet been executed--not an unexpired sentence of imprisonment where he was actually committed to DOC custody. A parolee, by contrast, would only be forced to serve the remainder of his unexpired sentence of imprisonment in the case of parole revocation. State ex rel. Corgan v. King, 1994 OK CR 7, ¶ 9, 868 P.2d 743, 745.

¶120 "Parole is a discretionary act of the Governor which releases a person from jail, prison or other confinement, after actually serving a part of the sentence. Probation, on the other hand, relates to judicial action taken before the prison door is closed, and is part of the sentence imposed." Swart v. State, 1986 OK CR 92, ¶ 16 n.9, 720 P.2d 1265, 1270 n.9. This distinction is critical in light of the plain language of the statute defining this statutory aggravating circumstance, i.e., "[t]he murder was committed by a person while serving a sentence of imprisonment on conviction of a felony." 21 O.S.2011, § 701.12(6). Had the Legislature intended for the serving a sentence of imprisonment aggravator to apply to unexecuted, suspended sentences like the one at issue here, it could easily have said so. Because it did not, however, we must follow the plain language of the statute and strike the jury's finding of this aggravator here. Newlun v. State, 2015 OK CR 7, ¶ 8, 348 P.3d 209, 211 ("We must hold a statute to mean what it plainly expresses and cannot resort to interpretive devices to create a different meaning."). We will discuss below, in connection with our mandatory sentence review, the effect of this error on Appellant's death sentence.

¶121 In Proposition XIII, Appellant argues that insufficient evidence was presented to support the jury's finding that "[t]he murder was especially heinous, atrocious, or cruel." See 21 O.S.2011, § 701.12(4). In reviewing an evidentiary sufficiency challenge to an aggravating circumstance, we take the record evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the aggravator beyond a reasonable doubt. Coddington v. State, 2011 OK CR 17, ¶ 62, 254 P.3d 684, 710; DeRosa v. State, 2004 OK CR 19, ¶ 85, 89 P.3d 1124, 1153.

¶122 A particular murder is especially heinous, atrocious or cruel where the evidence shows: (1) that the murder was preceded by either torture of the victim or serious physical abuse; and (2) that the facts and circumstances of the case establish that the murder was heinous, atrocious or cruel. Postelle, 2011 OK CR 30, ¶ 79, 267 P.3d at 143. The "term 'torture' means the infliction of either great physical anguish or extreme mental cruelty." Id. A finding of "serious physical abuse" or "great physical anguish" requires that the victim have experienced conscious physical suffering prior to death. Id. "[T]he term 'heinous' means extremely wicked or shockingly evil; the term 'atrocious' means outrageously wicked and vile; and the term 'cruel' means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others." Id.

¶123 Taken in the light most favorable to the State, the evidence shows the victim was not only aware of Appellant's attack but that she cried for help and actively resisted the stabbing for a significant period of time. Appellant inflicted numerous and repeated severe injuries to vital areas of the victim's body with the flimsy serrated steak knife. Many of these stab wounds cut through bone and vital organs. The surveillance video shows the victim was alive, conscious and moving during the attack. A defensive wound was evident on her hand along with a broken finger and fractured thumb, all suggesting active resistance. The presence of numerous superficial cuts confirms what the surveillance video shows, namely, that Appellant stabbed at the victim many more times than what was required to inflict the seven stab wounds.

¶124 True, Appellant launched a rapid attack in which he repeatedly stabbed the victim over a short period of time. But there is no question the stab wounds and superficial cuts he inflicted would have been painful. And the surveillance video shows the victim's death was not instantaneous. Rather, she actively resisted for a portion of Appellant's attack. "Evidence that the victim was conscious and aware of the attack supports a finding of torture and serious physical abuse." Frederick, 2017 OK CR 12, ¶ 109, 400 P.3d at 817. The victim's inability to more actively (and visibly) resist may be explained by Appellant sitting on the victim while stabbing her as well as the injuries he inflicted to her throat which likely prevented her from speaking.

¶125 In Cole v. State, 2007 OK CR 27, 164 P.3d 1089, we found sufficient evidence supported the especially heinous, atrocious or cruel aggravating circumstance where the infant victim suffered a fairly quick death but the evidence showed defendant forcefully folded his daughter over backwards until her spine snapped and her aorta tore. The medical examiner testified these injuries would be painful and unconsciousness was not immediate. However, the victim was likely not conscious for more than 30 seconds after her spine snapped and she probably died within two or three minutes. Because of the great amount of protracted deliberate force inflicted, however, we found this aggravator was supported by the evidence. Although fairly quick, the victim's death "was far from painless [and] the pain was likely excruciatingly horrible." We found this evidence of conscious physical suffering was "unlike 'virtually all murders,' thereby placing this crime within the narrowed class of individuals for which capital punishment is a valid option." Id., 2007 OK CR 27, ¶¶ 41-47, 164 P.3d at 1098-99. See also Cole v. Trammell, 755 F.3d 1142, 1166-71 (10th Cir. 2014) (upholding on habeas review the finding of the heinous, atrocious or cruel aggravator on these facts).

¶126 In the present case, Appellant inflicted numerous severe stab wounds and superficial cuts to the victim. Although her injuries were delivered rapidly and her death was relatively quick, there is no question the victim suffered excruciating pain from the stab wounds and cuts at the hands of her estranged boyfriend as she and several bystanders resisted his attack. The surveillance video of the killing reveals a ferocious attack launched by Appellant against the victim in a public place after following and cornering her near the glass doors. Considering the nature of the injuries, many of the victim's stab wounds would require tremendous force to inflict using the flimsy white-handled steak knife found near the body.

¶127 Although brief, the conscious physical suffering endured by the victim was extreme and qualitatively separates this case from the many murders where the death penalty was not imposed. The sheer brutality of the injuries, combined with the victim's active and on-going resistance together with the mental anguish of being stabbed repeatedly, further separates this case from virtually all other murders. The total evidence shows the requisite conscious physical suffering to demonstrate that the victim endured serious physical abuse prior to death. As in Cole, we find the intensity of suffering caused by the rapidly inflicted injuries here warrants a finding that this evidence of conscious physical suffering and mental anguish was unlike virtually all murders, thereby placing this crime within the narrowed class of individuals for which capital punishment is a valid option. See Maynard v. Cartwright, 486 U.S. 356, 362-65, 108 S. Ct. 1853, 1858-59, 100 L. Ed. 2d 372 (1988).

¶128 In addition, the evidence shows Appellant intended to inflict a high degree of pain and suffering on his estranged girlfriend and that he did so with utter indifference to the victim's conscious physical suffering. Appellant's attack on Tia Bloomer in the downtown bus station was pitiless and showed no feeling or mercy towards the victim as he thwarted the efforts of both bystanders and the victim to resist his onslaught. Given the couple's tumultuous history, the victim too surely experienced increased anxiety and mental anguish when Appellant appeared, attempted to speak with her and followed her around inside the bus terminal. Appellant attacked the victim only after she rejected his advances to talk inside the bus terminal and walked away, further increasing the already tense relations between the two and sparking Appellant's unrestrained violence and fury towards her. The jury could infer that Appellant sought to (and in fact did) severely punish the victim when delivering the deadly knife attack. Under these circumstances, the victim's murder was, at the least, "cruel" in light of our definitional interpretation of the statutory language for the especially heinous, atrocious or cruel aggravator. These facts further place the crime within the narrowed class of individuals for which capital punishment is a valid option.

¶129 Taken in the light most favorable to the State, any rational trier of fact could have found the victim was conscious for a significant portion of the stabbing and that she suffered the requisite torture or serious physical abuse. Sufficient evidence was therefore presented to show the existence beyond a reasonable doubt that this brutal murder was especially heinous, atrocious or cruel. Proposition XIII is denied.

¶130 In Proposition XIV, Appellant complains that the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and applied in an overbroad manner. We have repeatedly rejected this claim in light of the limiting construction we have applied to this aggravator as discussed above in Proposition XIII. See, e.g., Martinez, 2016 OK CR 3, ¶ 67, 371 P.3d at 1116. Notably, that limiting construction was provided to the jury in the written instructions provided for this aggravating circumstance. Proposition XIV is denied.

¶131 In Proposition XV, Appellant complains that reversible error arose from his outburst before the jury during his mother's penalty phase testimony. Appellant's outburst occurred when the prosecutor objected to Sheryl Wilson's testimony concerning domestic violence by Roy Tryon. The prosecutor objected on grounds of relevance because there was no evidence that Appellant had witnessed the specific instance of domestic violence being described by Wilson. When the prosecutor asked to approach the bench, the following exchange occurred:

MS. LAVENUE: Your Honor, I'd ask to approach again.

THE COURT: Okay. Come on up.

[DEFENDANT]: Mama, tell it how it is, man, fuck, Blood.

THE COURT: Hey, hey, stop, stop.

[DEFENDANT]: It can't be fucking hurt no more than I already in some shit.

THE COURT: Stop, stop.

[DEFENDANT]: I'm just saying quit holding things back. You need to tell them how the fuck it is.

THE COURT: If you guys would please step out for me, please.

(Jurors exited the proceedings.)

[DEFENDANT]: I'm already facing the DP. Fuck these people, I'm saying. (Unintelligible).

I don't give a fuck. I'm tired of this trial anyway. I need the death penalty. I don't give a fuck about this shit, man.

MS. FREEMAN-JOHNSON: All right.

THE COURT: Do you want to stay down here or do you want to go upstairs?

[THE DEFENDANT]: Yeah, just take me back to the jail. I mean, fuck, I don't need to be in here. Give me the DP. That's the fuck I've been asking for since day one. Give me the fucking DP, straight up, man. Quit bringing me the fuck over here, man.

(Tr. VII 1555-56).

¶132 The trial court ordered Appellant taken back upstairs and defense counsel stated they were going to talk to Appellant. The witness left the stand after proclaiming "I'm done too." Before he was led out of court, Appellant stated, apparently to the prosecutor, "You keep jumping up and objecting to shit, like mother fuck is lying." After a brief recess, a record was made during which defense counsel requested a mistrial based on Appellant's outburst. The trial court also issued a bench warrant to authorize the arrest of Sheryl Wilson who, by this point, had left the courthouse. The trial court denied the defense request for a mistrial and to question the jurors individually concerning what each one heard and whether it would affect their ability to sit on the case. The trial court then admonished Appellant that further outbursts would result in his permanent banishment from the courtroom. The jury was brought in and, after explaining that a new witness was going to be called out of order, the trial court admonished the jury to "don't let that be part of your deliberation or cause you any concerns. And also please disregard the defendant's outburst earlier and please do not let that be a part of your deliberation or cause of concern." The trial then resumed.

¶133 The trial court did not abuse its discretion in denying Appellant's request for mistrial. Knighton, 1996 OK CR 2, ¶ 64, 912 P.2d at 894 (whether to grant a mistrial at defense request is left to the trial court's sound discretion). "A mistrial is an appropriate remedy when an event at trial results in a miscarriage of justice or constitutes an irreparable and substantial violation of an accused's constitutional or statutory right." Id., 1996 OK CR 2, ¶ 65, 912 P.2d at 894. Here, the trial court intervened decisively by removing the jury in response to Appellant's outburst. The trial court then admonished the jury to disregard Appellant's outburst. Jurors are presumed to follow their instructions. Blueford v. Arkansas, 566 U.S. 599, 606, 132 S. Ct. 2044, 2051, 182 L. Ed. 2d 937 (2012). We have held too in a slightly different context that the court's admonishment of the jury to disregard a witness's vile language towards defense counsel prompted by defense counsel's conduct, along with a prejudicial outburst by a spectator, cured any error. Johnson v. State, 1979 OK CR 65, ¶¶ 3-4, 597 P.2d 340, 341-42; Cooper v. State, 1974 OK CR 131, ¶¶ 24-25, 524 P.2d 793, 798; McDaniel v. State, 1973 OK CR 222, ¶ 12, 509 P.2d 675, 679-80.

¶134 The incident in the present case was of short duration and the trial court took appropriate measures to reduce the risk of unfair prejudice. See Williams v. State, 2001 OK CR 9, ¶¶ 56-57, 22 P.3d 702, 717-18. Moreover, Appellant is solely responsible for any prejudice arising from this outburst. An appellant will not be permitted to profit on appeal from alleged error he or his counsel invited. See Slaughter v. State, 1997 OK CR 78, ¶ 101 n.18; 950 P.2d 839, 865 n.18 (citing cases). All things considered, the trial court did not abuse its discretion in denying Appellant's motion for mistrial or in declining his motion to question the jurors about what they had heard. Proposition XV is denied.

¶135 In Proposition XVII, Appellant challenges the constitutionality of capital punishment. He cites Justice Breyer's dissent in Glossip v. Gross, __U.S.__, 135 S. Ct. 2726, 192 L. Ed. 2d 761 (2015) to support this claim. We reject Appellant's invitation to revisit this issue. We have repeatedly held that capital punishment does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. See, e.g., Miller, 2013 OK CR 11, ¶ 213, 313 P.3d at 998; Johnson v. State, 2012 OK CR 5, ¶¶ 33-34, 272 P.3d 720, 731-32. Appellant's claim is notable for its failure to cite controlling authority overruling our prior decisions in this area. Appellant's scant arguments here invoke the alleged unreliability of capital punishment, its supposed arbitrariness in application, the delay associated with its use and the decision by other States not to use it. These non-case-specific complaints amount to basic policy disagreements with the sentence itself which are more appropriately made to the Legislature. Proposition XVII is denied.

¶136 In Proposition XVIII, Appellant asserts previously rejected claims challenging several uniform Oklahoma capital sentencing instructions given in this case. Appellant asks this Court to reconsider our prior rulings on these issues so he may preserve them for later federal review. First, Appellant did not object to the penalty phase instructions, thus waiving all but plain error review on appeal. Jackson, 2016 OK CR 5, ¶ 4, 371 P.3d at 1121. Second, there is no error, let alone plain error, in light of our previous rejection of these claims and our review of the total instructions given here. Mitchell v. State, 2016 OK CR 21, ¶ 27, 387 P.3d 934, 944 ("As there is no error, there is no plain error."). Claim A: Harmon, 2011 OK CR 6, ¶ 85, 248 P.3d at 944-45 (rejecting claim that OUJI-CR 4-78 improperly allowed the jury to disregard the mitigating evidence presented). Claim B: Mitchell v. State, 2010 OK CR 14, ¶ 122, 235 P.3d 640, 664 (rejecting claim that OUJI-CR 4-76 erroneously implied that a non-capital sentence is appropriate only if the jury failed to find existence of an aggravating circumstance). Claim C: Cuesta-Rodriguez, 2010 OK CR 23, ¶¶ 72-74, 241 P.3d at 237 (rejecting claim that the phrase "unique loss to society and the family" in OUJI-CR 9-45 improperly allowed jurors to consider the impact of the loss of the victim on society rather than simply the impact on the immediate family in light of victim impact statute). Claim D: Johnson, 2012 OK CR 5, ¶ 22, 272 P.3d at 728-29 (State is not required to prove beyond a reasonable doubt that the alleged aggravating circumstances outweigh mitigating circumstances nor is such an instruction required); Mitchell, 2010 OK CR 14, ¶ 123, 235 P.3d at 664 (rejecting challenge that OUJI-CR 4-80 weighing instruction procedures contravene the heightened need for reliability in death penalty cases). Proposition XVIII is denied.

PROSECUTORIAL MISCONDUCT

¶137 In Proposition XVI, Appellant alleges various instances of prosecutorial misconduct at trial. We will not grant relief for improper argument unless, viewed in the context of the whole trial, the statements rendered the trial fundamentally unfair, so that the jury's verdict is unreliable. Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986); Pullen, 2016 OK CR 18, ¶ 13, 387 P.3d at 927.

¶138 First, Appellant complains the prosecutor improperly defined "justice" for the jury. During voir dire, the prosecutor told prospective juror J.H. that "[t]he dictionary defines justice as rendering unto each man or woman that which he or she is due." With that definition in mind, the prosecutor asked J.H. whether she could "sit in this case and see that justice is done?" When J.H. replied "yes", the prosecutor followed up and asked whether she realized that could mean finding the defendant guilty or it could mean acquitting the defendant. The prosecutor then asked the other prospective jurors whether they could do the same thing. The prospective jurors agreed that they could do justice in the case based on the evidence. During this discussion, the prosecutor told the panel that what the attorneys said is not evidence and that the trial judge would give the jury instructions at the end of the case to "lay out exactly what it is that you have to do or, I mean, what the rules are."

¶139 At the end of the State's second closing argument, the prosecutor revisited the earlier discussion she had with the jurors about doing justice in the case:

Ladies and gentlemen of the jury, I ask each of you, when you were chosen, if you could sit in this case and see that justice is done. And justice was defined to you as rendering unto each man or woman that which he or she is due. I would submit to you that the State of Oklahoma has proved beyond all doubt that on March the 16th of 2012 [Appellant] murdered Tia Bloomer; that he had malice aforethought.

(Tr. V 1172). The prosecutor then briefly urged that stabbing someone in the vital areas of the body, as Appellant had done to the victim, showed malice aforethought. Thus, the prosecutor argued, Appellant killed the victim with malice aforethought and a verdict of guilty on first degree murder was warranted.

¶140 Later, during final penalty phase closing, the prosecutor once again briefly revisited the earlier discussion about justice she had with the jurors during voir dire. The prosecutor then continued with her argument by discussing the evidence supporting Appellant's mitigating circumstances. During this argument, the prosecutor urged that the "fair" and "just" punishment for Tia Bloomer's murder was the death penalty; "that, when we talk about justice and rendering unto each man what he is due, that is what he is due."

¶141 Appellant did not object to any of these arguments below. He has therefore waived on appeal all but plain error. Sanchez v. State, 2009 OK CR 31, ¶ 72, 223 P.3d 980, 1004. Appellant fails to show error, let alone plain error, from these comments. In Grant v. State, 2009 OK CR 11, ¶ 64, 205 P.3d 1, 25, we rejected virtually this same argument, finding that "[w]hatever the source of the definition, it was within the bounds of proper argument." Appellant fails to show plain or obvious error affecting his substantial rights, particularly considering the prosecutor's focus on the evidence during her closing argument in urging the jury both to convict and, then later, sentence Appellant to death. Relief is denied for this particular claim.

¶142 Finally, Appellant cries foul over several of the prosecutor's questions on cross-examination of Dr. Fabian during penalty stage. Appellant also challenges in one instance the prosecutor's questioning of Dr. Musick. Some of the questions now challenged by the prosecutor drew proper objections at trial whereas others did not. Regardless, we have reviewed the prosecutor's various questions challenged here and find no error. "Cross-examination is permissible into 'matters affecting the credibility of the witness.'" Harris v. State, 1989 OK CR 34, ¶ 9, 777 P.2d 1359, 1362 (quoting 12 O.S.1981, § 2611). The prosecutor did nothing more in the challenged passages than impeach, or attempt to impeach, each expert's credibility based on issues raised by their testimony on direct examination. This was wholly permissible, see McElmurry v. State, 2002 OK CR 40, ¶ 120, 60 P.3d 4, 29-30, and Appellant fails to show that he was denied a fundamentally fair sentencing proceeding based on the prosecutor's cross examination. Proposition XVI is denied.

CUMULATIVE ERROR

¶143 In Proposition XIX, Appellant claims that relief is warranted based on cumulative error. In this case, we assumed first stage error based on the trial court's admission of the third sentence of the text message evidence in which the victim expressly identified Appellant as her attacker. We nonetheless found any error harmless in light of the overwhelming evidence of Appellant's guilt along with the properly admitted evidence establishing Appellant's responsibility for previously choking the victim (Proposition III). We also assumed first stage error from the trial court's disallowance of testimony from Appellant's brother and cousin concerning whether Appellant expressed any desire to harm the victim or otherwise expressed concern about getting the text message from her. However, we found no plain error based on the overwhelming evidence of guilt which the omitted evidence would not overcome (Proposition IV). Also, we invalidated the serving a sentence of imprisonment aggravator, finding that it did not apply to defendants who kill while serving a suspended sentence (Proposition XII). We address the impact of this invalid aggravator more fully in our mandatory sentence review.

¶144 We find that the cumulative effect of these errors does not warrant relief. This simply is not a case where numerous irregularities during Appellant's trial tended to prejudice his rights or otherwise deny Appellant a fair trial. See Martinez, 2016 OK CR 3, ¶ 85, 371 P.3d at 1119 (reciting cumulative error standard). Proposition XIX is denied.

MANDATORY SENTENCE REVIEW

¶145 This Court must determine in every capital case: (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of the statutory aggravating circumstances. 21 O.S.2011, § 701.13(C). As discussed earlier, we invalidated the serving a sentence of imprisonment aggravator. See Proposition XII. We also found sufficient evidence supported the especially heinous, atrocious or cruel aggravating circumstance. See Proposition XIII. Sufficient evidence was also presented to support the prior violent felony aggravator based upon the admission of State's Exhibits 60-61, the judgment and sentence documents evidencing Appellant's four prior convictions for Assault with a Dangerous Weapon.

¶146 Additionally, the State presented sufficient evidence in support of the continuing threat aggravator. "To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future." Lockett, 2002 OK CR 30, ¶ 32, 53 P.3d at 428 (quoting Hain v. State, 1996 OK CR 26, ¶ 67, 919 P.2d 1130, 1147).

¶147 Here, the State presented evidence during penalty phase showing Appellant: 1) attempted to pull a loaded 9mm on a uniformed Oklahoma City police officer during a foot chase and subsequent take down; 2) opened fire into a crowd of bystanders he was chasing in a hotel parking lot then ran inside the hotel, ditched the gun and altered his appearance in an effort to avoid arrest for the shooting; 3) was shocked with a Taser and forcibly removed from his mother's residence after physically fighting with police officers responding to a call for help from Appellant's mother; 4) claimed gang affiliation, had gang tattoos and had been shot at during a gang shooting; 5) engaged in fights with other inmates in the county jail, one of which was captured on surveillance video and shows Appellant beating up inmate Dartangan Cotton; 6) punched a female cousin in the face at the family home during a Christmas Eve fight with his brother Rico resulting in Appellant's arrest; and 7) was on supervised probation, serving a suspended sentence for his prior convictions of Assault with a Dangerous Weapon, when he murdered the victim. See Romano v. State, 1993 OK CR 8, ¶ 92, 847 P.2d 368, 389, aff'd, Romano v. Oklahoma, 512 U.S. 1, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994) (evidence of a defendant's criminal record, or prior unadjudicated acts of violent conduct, is relevant to show future dangerousness and, thus, the continuing threat aggravator). In addition, the State elicited on cross-examination testimony from Sheryl Wilson that she had witnessed Appellant head butt and beat Tia Bloomer. Dr. Fabian too testified that Appellant meets the criteria for antisocial personality disorder.

¶148 We now assess the impact of the invalidated aggravator on Appellant's death sentence. In this analysis, "we must determine both that the remaining aggravating circumstances outweigh the mitigating circumstances and the weight of the improper aggravator is harmless." Malone v. State, 2013 OK CR 1, ¶ 87, 293 P.3d 198, 221. The prior violent felony aggravator and continuing threat aggravator enabled the jury to give aggravating weight to the same facts and circumstances used to support the invalid aggravator, i.e., the judgment and sentence documents reflecting Appellant, at the time of the murder, was serving a suspended sentence for his prior felony convictions for Assault with a Dangerous Weapon. Thus, the invalid aggravator could not have skewed the sentence imposed, and no constitutional violation occurred. See Brown v. Sanders, 546 U.S. 212, 220, 126 S. Ct. 884, 892, 163 L. Ed. 2d 723 (2006); Myers, 2006 OK CR 12, ¶ 105, 133 P.3d at 337.

¶149 With this finding, we conduct an independent reweighing of the aggravating and mitigating evidence to determine the validity of Appellant's death sentence. Malone, 2013 OK CR 1, ¶ 87, 293 P.3d at 221-22; Myers, 2006 OK CR 12, ¶ 106, 133 P.3d at 337. In this regard we have held:

when this Court invalidates an aggravator and at least one valid aggravating circumstance remains which enables the jury . . . to give aggravating weight to the same facts and circumstances which supported the invalid aggravator, it will continue to reweigh the evidence and uphold the death sentence if the remaining aggravating circumstances outweigh the mitigating circumstances and the weight of the improper aggravator is harmless. Clemons v. Mississippi, 494 U.S. 738, 741, 110 S. Ct. 1441, 1444, 108 L. Ed. 2d 725 (1990); Valdez v. State, 1995 OK CR 18, ¶ 73, 900 P.2d 363, 384. We may find an improper aggravator to be harmless error if, looking at the record, the Court finds that the elimination of the improper aggravator cannot affect the balance beyond a reasonable doubt. McGregor v. State, 1994 OK CR 71, ¶ 48, 885 P.2d 1366, 1385-86. This "independent reweighing of aggravating and mitigating circumstances where one of several aggravating circumstances has been invalidated is implicit to our statutory duty to determine the factual substantiation of a verdict and validity of a death sentence." McGregor, id.

Myers, 2006 OK CR 12, ¶ 106, 133 P.3d at 337. 

¶150 In the present case, three aggravating circumstances remain: the prior violent felony aggravator; the continuing threat aggravator; and the especially heinous, atrocious or cruel aggravator. 21 O.S.2011, § 701.12(1), (4), (7). The evidence supporting all three aggravating circumstances was strong. The evidence detailed earlier showed not only Appellant's prior felony convictions for four counts of Assault with a Dangerous Weapon but also numerous instances of prior violent acts towards police officers, family members, the victim, other inmates and the public supporting the continuing threat aggravator. Appellant's murder of Tia Bloomer in a crowded public place while serving a sentence of supervised probation likewise supports this aggravator as does the callous and brutal nature of the killing itself. See Hooks, 1993 OK CR 41, ¶ 33, 862 P.2d at 1282-83. Moreover, as discussed in Proposition XIII, the evidence showed the victim endured conscious physical suffering as Appellant stabbed her repeatedly in the bus station, thus supporting the especially heinous, atrocious, or cruel aggravator.

¶151 Appellant presented abundant mitigation evidence from his family members covering virtually every aspect of his life. This included first-hand accounts concerning Appellant's drug abuse; learning disabilities; educational background; prior incarcerations; prior head injuries; suicide attempts; family background; mental health treatment and institutionalization; prior incarcerations of his mother, father and siblings; gang involvement; the crowded conditions at the family home; the fact the family constantly moved; the non-stop drug activity at the family home; the routine absence of Appellant's mother from the family home while on multi-day drug binges; Appellant's mother buying drugs from Appellant and his brother; Sheryl's physical abuse of her children; Appellant's drug dealing; Appellant's love for his son; the nature of Appellant's relationship with the victim; and the nature of Appellant's relationship with his mother.

¶152 The defense also presented expert testimony from Dr. Fabian, a neuropsychologist, that Appellant was low functioning (but not mentally retarded) and suffered both from mental illness and brain damage. Appellant presented this testimony along with anecdotal evidence from family members concerning his cognitive and developmental limitations, his mental health treatment and his experience taking--then discontinuing--medications prescribed specifically for his mental issues. Dr. Musick, a sociology professor, was presented by the defense as an expert witness to discuss the risk factors and events from Appellant's life history which impacted his development. This was offered to explain Appellant's pattern of illegal behavior culminating in his murder of Tia Bloomer.

¶153 Upon reweighing the remaining valid aggravating circumstances against the mitigation evidence, we find the aggravating circumstances outweighed the mitigating evidence and supported the death sentence. Had the jury considered only these valid aggravating circumstances, we find beyond a reasonable doubt the jury would have imposed the same sentence of death. Upon review of the record, we are also satisfied that neither passion, prejudice nor any other arbitrary factor contributed to the jury's sentencing determination. After carefully reviewing the evidence presented, we find too that it supported the jury's finding of the three valid aggravating circumstances.

DECISION

¶154 The Judgment and Sentence of the district court is AFFIRMED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2018), the MANDATE is ORDERED issued upon delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE CINDY H. TRUONG, DISTRICT JUDGE

 
 
 
 APPEARANCES AT TRIAL
 
 
 APPEARANCES ON APPEAL
 
 
 
 
 MELANIE FREEMAN-JOHNSON
 JAMES T. ROWAN
 LAURA SAMS
 ASSISTANT PUBLIC DEFENDERS
 320 ROBERT S. KERR, SUITE 611
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR DEFENDANT
  
 
 
 ANDREA DIGILIO MILLER
 ASSISTANT PUBLIC DEFENDER
 320 ROBERT S. KERR, SUITE 611
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR APPELLANT
  
 
 
 
 
 SUZANNE LAVENUE
 MERYDITH EASTER
 ASSISTANT DISTRICT ATTORNEYS
 320 ROBERT S. KERR, SUITE 505
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR STATE
 
 
 E. SCOTT PRUITT
 OKLAHOMA ATTORNEY GENERAL
 JENNIFER J. DICKSON
 ASSISTANT ATTORNEY GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 
 

OPINION BY: HUDSON, J.
LUMPKIN, P.J.: CONCUR IN PART/DISSENT IN PART 
LEWIS, V.P.J.: CONCUR
KUEHN, J.: CONCUR IN PART/DISSENT IN PART
MUSSEMAN, D.J.[11]: CONCUR

FOOTNOTES

[1] The jury found: 1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) the murder was committed by a person while serving a sentence of imprisonment on conviction of a felony; 3) at the present time there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society; and 4) the murder was especially heinous, atrocious, or cruel. 21 O.S.2011, § 701.12.

[2] See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Appellant complains that the abuse of discretion standard we use to evaluate the district court's limitations on voir dire does not apply when a constitutional error is alleged. Notably, Appellant cites no authority for this proposition. There is nothing inconsistent with our use of the abuse of discretion standard in this context. Simply, we apply Morgan's pronouncement that the trial court's broad discretion in conducting voir dire is subject to the essential demands of fundamental fairness. If Appellant's trial was not rendered fundamentally unfair from the trial court's exercise of discretion in limiting voir dire then there is no abuse of discretion and, thus, no basis for relief.

[4] We note that the trial court as part of its questioning asked the prospective jurors, consistent with Morgan, whether they would automatically impose the death penalty if they found Appellant guilty of first degree murder.

[5] Appellant's trial objection to these photographs appears to reference the objections he made to various autopsy photographs at an in camera hearing the day before. The problem, however, is that none of the photographs discussed at the in camera hearing were marked as exhibits. We can identify several discrete objections made by defense counsel to certain categories of photographs--for example, defense counsel objected to the autopsy photographs depicting the wooden Q-tip swabs in the wounds to illustrate directionality of the wound; to the photograph of the victim's face; and to the photograph depicting the thin metal probe through the victim's hand. But we cannot discern from the record of the pre-trial hearing any objections to the photographs which were later admitted as State's Exhibits 28--36.

[6] Notably, defense counsel was unable to identify any act of provocation during the instructions conference but explained that he was requesting the instruction anyway because "I'm not a juror. So a juror might have seen something."

[7] Rico Wilson testified that he last saw Appellant sitting by himself on the steps of his mother's apartment around 9:30 or 10:00 p.m. on March 15th. Rico testified he was "pretty sure" Appellant was high at the time. However, Rico denied knowing anything about what happened at the bus station the next day.

[8] Title 12, O.S.Supp.2013, § 2703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

[9] Title 12, O.S.2011, § 2705 states:

An expert may testify in terms of opinion or inference and give reasons therefor without previous disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

[10] In 2011, when Appellant received his ten year suspended sentence, the statutory language authorizing court-ordered supervision by the District Attorney's Office was set forth at 22 O.S.2011, § 991a(A)(1)(s). The District Attorney's Office falls, for purposes of this statutory language, under the provisions of "other person designated by the Court." State ex rel. Mashburn v. Stice, 2012 OK CR 14, ¶ 14, 288 P.3d 247, 251.

[11] The Honorable William J. Musseman, Tulsa County District Judge, sitting by assignment.

LUMPKIN, PRESIDING JUDGE: CONCUR IN PART/DISSENT IN PART

¶1 I concur in affirming the Judgment and Sentence in this case but write separately to address Proposition XII and the striking of the aggravator of "serving a sentence of imprisonment on conviction of a felony". 21 O.S.2011, § 701.12(6). I disagree with the interpretation expressed in the opinion of a suspended sentence not coming within the parameters of the aggravator. I believe the opinion "strains a gnat's hair" to get to the result reached and I see no difference between the parolee committing murder and a person on a suspended sentence committing murder. The analysis used in the opinion applies form over substance as to the condition of the defendant when a murder is committed. I would uphold the aggravator finding it supported by sufficient evidence.

KUEHN, JUDGE, CONCURRING IN PART, DISSENTING IN PART:

¶1 In Proposition III, the Majority discusses the admissibility of a three-sentence text message that the victim sent to Appellant the night before he killed her: "It's okay bc im [sic] going to tell the truth tomorrow. I'm tired of lies for yhu [sic]. Isaiah Tryon is the guy who choked nd [sic] nearly killed me Saturday." The Majority finds that admission of this statement did not violate Appellant's Sixth Amendment right to confront his accusers, because it was not testimonial in nature. I agree with that conclusion. Turning next to the statement's admissibility under the Evidence Code, the Majority finds that the first two sentences of the text are hearsay, but admissible under the "state of mind" exception to the general ban on hearsay evidence. 12 O.S.2011, § 2803(3). I agree with that analysis as well.

¶2 The Majority finds the third sentence -- which directly accuses Appellant of domestic abuse -- admissible under the same state-of-mind exception. I disagree with that analysis. After conceding that the state-of-mind exception expressly disallows statements "of memory or belief to prove the fact remembered or believed," id., the Majority nevertheless tries to defend the victim's reference to past abuse under this exception by distinguishing statements merely about prior acts from those that actually describe the events in question. Statements about past events, offered to prove the past event, simply are not contemplated by the state-of-mind exception. No matter how hard you hit a square peg, it won't fit into a round hole.[1]

¶3 To determine admissibility of an unsworn statement, the questions to be asked are: (1) Is it hearsay? (2) If so, does it meet an exception to the general rule barring hearsay? (3) If so, is it relevant? and (4) Even if it is relevant, is its probative value substantially outweighed by unfair prejudice? I believe the accusation of prior abuse -- indeed, the entire text message -- is admissible under the "forfeiture by wrongdoing" doctrine. 12 O.S.Supp.2014, § 2804(B)(5). And I believe the entire message, admissible under this exception, was relevant to show Appellant's intent and motive for killing the victim and had considerable probative value. Because trial courts and counsel look to this Court for guidance on evidentiary issues, I believe the doctrine of forfeiture by wrongdoing merits additional discussion.

¶4 Because the text message referred to another crime, the State gave pretrial notice of its intent to offer the evidence. 12 O.S.2011, § 2404(B); Burks v. State, 1979 OK CR 10, 594 P.2d 771. At a hearing, the prosecutor argued that the victim's text message was admissible on equitable grounds, because it was reasonable to infer that Appellant killed the victim to prevent her from making good on her threat to report his prior abuse to the police. Well-established at common law, the doctrine of forfeiture by wrongdoing holds that the State is absolved of its duty to bring the accuser to court if the defendant has taken part in a scheme to keep her away. Giles v. California, 554 U.S. 353, 366-68, 128 S.Ct. 2678, 2687-88, 171 L.Ed.2d 488 (2008); Davis v. Washington, 547 U.S. 813, 833, 126 S.Ct. 2266, 2280, 165 L.Ed.2d 224 (2006); Hunt v. State, 2009 OK CR 21, ¶ 8, 218 P.3d 516, 518. The doctrine is an equitable remedy. It is concerned only with fairness, i.e., it is not based on any conclusions about the inherent reliability of the statements themselves. Crawford v. Washington, 541 U.S. 36, 62, 124 S.Ct. 1354, 1370, 158 L.Ed.2d 177 (2004); Reynolds v. United States, 98 U.S. 145, 158--159, 25 L.Ed. 244 (1879).[2]

¶5 To support a finding of forfeiture by wrongdoing, the State must prove in a pretrial hearing, by a preponderance of evidence, that the defendant wrongfully caused the declarant's unavailability as a witness, and did so intending that result. 12 O.S.Supp.2014, § 2804(B)(5). The exception applies "only if the defendant has in mind the particular purpose of making the witness unavailable." Giles, 554 U.S. at 367, 128 S.Ct. at 2687. The court can consider the totality of the circumstances, including both pre-arrest and post-arrest conduct, which may include the charged crime if it was committed to prevent a witness from testifying. However, the context of the conduct is important to establish the defendant's intent, and to show what, specifically, the defendant did that made the witness choose not to testify. As well, hearsay evidence (not limited to the statements themselves) may be considered at that hearing. Davis, 547 U.S. at 833-34, 126 S.Ct. at 2280; 12 O.S.2011, § 2103(B)(1). Such a hearing should also address any other issues relevant to the statements, e.g., other-crimes evidence under § 2404(B) of the Evidence Code.[3] If the court finds, by a preponderance of evidence, that the defendant willfully procured the declarant's absence for the purpose of preventing her from giving evidence, then the doctrine will permit her unsworn, unconfronted statements to be offered into evidence. Davis, 547 U.S. at 833, 126 S.Ct. at 2280; Giles, 554 U.S. at 367, 128 S.Ct. at 2687. Evidence admissible under this theory is immune to both Confrontation-Clause and hearsay challenges. Giles, 554 U.S. at 365, 128 S.Ct. at 2686; United States v. Dhinsa, 243 F.3d 635, 652 (2nd Cir. 2001).

¶6 As the Supreme Court stressed in Giles, the State must show not only that the defendant procured the declarant's absence, but that he did so for the purpose of preventing her from testifying. But that conclusion, like any other, may legitimately rest on reasonable inferences from circumstantial evidence. From (1) the substance of the text message, (2) the fact that it was sent directly to Appellant, (3) Appellant's admission that, just hours later, he armed himself with a knife, purposefully sought the victim out, and fatally stabbed her, the trial court could reasonably infer that Appellant wrongfully procured the victim's absence to prevent her from publicly accusing him of domestic abuse.[4]

¶7 Admissibility and relevance are independent concepts. The text message, admissible via the forfeiture by wrongdoing doctrine, was relevant to show Appellant's intent and motive for the killing. Evidence of other crimes may be admitted for purposes of establishing intent or motive for the instant offense. 12 O.S.2011, § 2404(B). Other-crimes evidence should only be admitted if (among other things) it is "probative of a disputed issue of the crime charged." Eizember v. State, 2007 OK CR 29, ¶ 76, 164 P.3d 208, 230. Intent is an essential element of First Degree Malice Murder. Motive is not an element of murder, but it can be an extremely relevant basis for circumstantial inferences about the intent of the perpetrator. See e.g. Allen v. State, 1993 OK CR 49, ¶¶ 16-17, 862 P.2d 487, 491.

¶8 The fact that Appellant killed the victim was never in dispute, but his motive and intent certainly were. Appellant claimed he killed the victim out of jealousy, because he did not want anyone else to have her. Once it discovered the text messages, the State disputed that explanation and alleged that Appellant sought to kill the victim to prevent her from reporting his domestic abuse. The victim's text message was admissible in its entirety. There was no error here.

¶9 As to Proposition VI, the Majority finds that instructions on lesser forms of homicide were properly rejected. I agree, but wish to clarify that our focus must be not on whether the evidence supports the greater charge, but on whether any rational juror could have found the lesser charge. McHam v. State, 2005 OK CR 28, ¶ 21, 126 P.3d 662, 670. In my view, the manner in which the victim was killed is not as convincing on this point as the circumstances surrounding the killing: the domestic quarrels, the fight over child support, the victim's threat to report Appellant's domestic abuse, and, of course, the fact that Appellant admitted arming himself with a knife with the express intent to stab the victim if he saw her that day.

¶10 Finally, Appellant raises several constitutional issues which were not preserved at trial. It is unclear from the Opinion whether the Majority has considered these claims using the appropriate standard of review. In concluding that these issues do not require relief, I considered whether the alleged errors were harmless beyond a reasonable doubt, and determined that they were. Miller v. State, 2013 OK CR 11, ¶ 106, 313 P.3d 934, 972-73; Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

FOOTNOTES

[1] Furthermore, it's not clear how this accusation shows the victim's "state of mind," or why her state of mind would be relevant. It is certainly not an expression of fear; the victim is standing up for herself, heroically telling her abuser that she will not lie to the police about his actions.

[2] The reason behind the rule is summarized by Professor Wigmore:

[A defendant who procures the absence of a witness] ought of itself to justify the use of [the witness's] testimony -- whether the offering party has or has not searched for him, whether he is within or outside of the jurisdiction, whether his place of abode is secret or open; for any tampering with a witness should once [and] for all estop the tamperer from making any objections based on the results of his own chicanery.

5 Wigmore, Evidence §1405 (Chadbourn rev. 1974) (emphasis added).

[3] This will not always be the case. Assume that a defendant is on trial for conjoint robbery. His text messages threatening to harm his accomplice, if the accomplice testifies for the State, might be relevant in a pretrial hearing to show why the accomplice is unavailable and why his hearsay statements should be admitted; but those messages might not be relevant in the trial itself.

[4] The fact Appellant was on trial for the same "wrongdoing" that permitted introduction of the out-of-court statements in the first place is no impediment to admission. The same situation was present in Giles: the State charged the defendant with murdering his ex-girlfriend, and sought to introduce statements she had made before the killing, accusing Giles of domestic abuse and of threatening to kill her. The difference between Giles and this case is that in Giles, the statements were made to a police officer weeks before the killing. Giles, 554 U.S. at 356-57, 128 S.Ct. at 2681-82.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1988 OK CR 27, 750 P.2d 1132, RUMBO v. STATE
Discussed
 1988 OK CR 296, 767 P.2d 887, LAMB v. STATE
Discussed
 1989 OK CR 34, 777 P.2d 1359, HARRIS v. STATE
Discussed
 1991 OK CR 41, 809 P.2d 676, SELLERS v. STATE
Discussed
 1991 OK CR 121, 824 P.2d 364, BERGET v. STATE
Discussed
 1992 OK CR 40, 839 P.2d 1363, BOYD v. STATE
Discussed
 1993 OK CR 7, 846 P.2d 1124, WOODRUFF v. STATE
Discussed
 1993 OK CR 8, 847 P.2d 368, ROMANO v. STATE
Discussed
 1993 OK CR 41, 862 P.2d 1273, HOOKS v. STATE
Cited
 1993 OK CR 49, 862 P.2d 487, ALLEN v. STATE
Discussed
 1994 OK CR 7, 868 P.2d 743, STATE EX REL. CORGAN v. KING
Discussed
 1994 OK CR 40, 876 P.2d 690, SIMPSON v. STATE
Discussed
 1994 OK CR 44, 887 P.2d 1288, MAYES v. STATE
Discussed
 1994 OK CR 71, 885 P.2d 1366, McGREGOR v. STATE
Discussed
 1995 OK CR 18, 900 P.2d 363, VALDEZ v. STATE
Discussed
 1995 OK CR 79, 913 P.2d 1356, PENNINGTON v. STATE
Discussed
 1996 OK CR 2, 912 P.2d 878, KNIGHTON v. STATE
Discussed at Length
 1996 OK CR 26, 919 P.2d 1130, HAIN v. STATE
Discussed
 1996 OK CR 40, 924 P.2d 754, CHARM v. STATE
Discussed
 1979 OK CR 10, 594 P.2d 771, BURKS v. STATE
Discussed
 1979 OK CR 65, 597 P.2d 340, JOHNSON v. STATE
Discussed
 2001 OK CR 5, 21 P.3d 1047, 72 OBJ 858, BLACK v. STATE
Discussed at Length
 2001 OK CR 9, 22 P.3d 702, 72 OBJ 1068, WILLIAMS v. STATE
Discussed at Length
 2001 OK CR 11, 29 P.3d 569, 72 OBJ 1205, WARNER v. STATE
Discussed
 2001 OK CR 25, 32 P.3d 869, 72 OBJ 2629, CIPRIANO v. STATE
Discussed
 2001 OK CR 34, 37 P.3d 908, 72 OBJ 3509, FREDERICK v. STATE
Discussed
 1974 OK CR 131, 524 P.2d 793, COOPER v. STATE
Discussed
 2002 OK CR 30, 53 P.3d 418, LOCKETT v. STATE
Discussed at Length
 2002 OK CR 40, 60 P.3d 4, McELMURRY v. STATE
Discussed at Length
 2004 OK CR 16, 88 P.3d 893, PRIMEAUX v. STATE
Discussed at Length
 2004 OK CR 19, 89 P.3d 1124, DEROSA v. STATE
Discussed
 2005 OK CR 28, 126 P.3d 662, McHAM v. STATE
Discussed
 2006 OK CR 5, 128 P.3d 521, JONES v. STATE
Discussed at Length
 2006 OK CR 12, 133 P.3d 312, MYERS v. STATE
Discussed at Length
 2006 OK CR 17, 134 P.3d 150, JONES v. STATE
Discussed
 2006 OK CR 45, 146 P.3d 1149, JACKSON v. STATE
Discussed
 2007 OK CR 12, 157 P.3d 143, GLOSSIP v. STATE
Discussed at Length
 2007 OK CR 19, 159 P.3d 272, PAVATT v. STATE
Discussed at Length
 2007 OK CR 23, 164 P.3d 176, ANDREW v. STATE
Discussed at Length
 2007 OK CR 27, 164 P.3d 1089, COLE v. STATE
Discussed at Length
 2007 OK CR 29, 164 P.3d 208, EIZEMBER v. STATE
Discussed at Length
 2007 OK CR 42, 173 P.3d 81, BALL v. STATE
Discussed
 2008 OK CR 3, 177 P.3d 577, BROWN v. STATE
Discussed
 2009 OK CR 1, 201 P.3d 869, JONES v. STATE
Discussed
 2009 OK CR 11, 205 P.3d 1, GRANT v. STATE
Discussed
 2009 OK CR 13, 206 P.3d 1020, HANSON v. STATE
Discussed
 2009 OK CR 21, 218 P.3d 516, HUNT v. STATE
Discussed
 2009 OK CR 31, 223 P.3d 980, SANCHEZ v. STATE
Discussed
 2010 OK CR 6, 230 P.3d 888, SIMPSON v. STATE
Discussed
 2010 OK CR 7, 231 P.3d 1156, LOGSDON v. STATE
Discussed
 2010 OK CR 14, 235 P.3d 640, MITCHELL v. STATE
Discussed at Length
 2010 OK CR 23, 241 P.3d 214, CUESTA-RODRIGUEZ v. STATE
Discussed at Length
 2011 OK CR 4, 247 P.3d 1192, CUESTA-RODRIGUEZ v. STATE
Discussed at Length
 2011 OK CR 6, 248 P.3d 918, HARMON v. STATE
Discussed at Length
 2011 OK CR 12, 252 P.3d 221, UNDERWOOD v. STATE
Discussed at Length
 2011 OK CR 15, 255 P.3d 425, ROBINSON v. STATE
Discussed
 2011 OK CR 16, 251 P.3d 749, GRIMES v. STATE
Discussed at Length
 2011 OK CR 17, 254 P.3d 684, CODDINGTON v. STATE
Discussed
 2011 OK CR 29, 268 P.3d 86, DAVIS v. STATE
Discussed at Length
 2011 OK CR 30, 267 P.3d 114, POSTELLE v. STATE
Discussed at Length
 2012 OK CR 5, 272 P.3d 720, JOHNSON v. STATE
Discussed at Length
 2012 OK CR 14, 288 P.3d 247, STATE v. STICE
Discussed
 2013 OK CR 1, 293 P.3d 198, MALONE v. STATE
Discussed at Length
 2013 OK CR 11, 313 P.3d 934, MILLER v. STATE
Discussed at Length
 2015 OK CR 7, 348 P.3d 209, NEWLUN v. STATE
Discussed
 2016 OK CR 3, 371 P.3d 1100, MARTINEZ v. STATE
Discussed at Length
 2016 OK CR 5, 371 P.3d 1120, JACKSON v. STATE
Discussed at Length
 2016 OK CR 16, 387 P.3d 928, FRIDAY v. STATE
Discussed
 2016 OK CR 18, 387 P.3d 922, PULLEN v. STATE
Discussed at Length
 2016 OK CR 21, 387 P.3d 934, MITCHELL v. STATE
Discussed
 2017 OK CR 12, 400 P.3d 786, FREDERICK v. STATE
Discussed at Length
 2018 OK CR 7, DAVIS v. STATE
Cited
 2000 OK CR 7, 999 P.2d 1082, 71 OBJ 975, Hammon v. State
Discussed at Length
 2000 OK CR 11, 4 P.3d 702, 71 OBJ 1304, Bland v. State
Discussed at Length
 1962 OK CR 41, 370 P.2d 933, GLASGOW v. STATE
Cited
 1969 OK CR 177, 455 P.2d 735, LOVELL v. STATE
Discussed at Length
 1946 OK CR 12, 165 P.2d 846, 82 Okl.Cr. 31, Grindstaff v State
Discussed
 1983 OK CR 57, 665 P.2d 1186, DAVIS v. STATE
Discussed
 1997 OK CR 35, 942 P.2d 736, CLEARY v. STATE
Discussed at Length
 1997 OK CR 59, 947 P.2d 565, 68 OBJ 3534, Humphreys v. State
Discussed at Length
 1997 OK CR 64, 947 P.2d 1090, 68 OBJ 3623, Hooper v. State
Discussed at Length
 1997 OK CR 78, 950 P.2d 839, 69 OBJ 87, Slaughter v. State
Discussed
 1998 OK CR 7, 954 P.2d 148, 69 OBJ 592, Hemphill v. State
Discussed
 1998 OK CR 24, 970 P.2d 1158, 69 OBJ 1501, Lewis v. State
Discussed
 1998 OK CR 28, 961 P.2d 838, 69 OBJ 1803, Cannon v. State
Discussed
 1998 OK CR 39, 964 P.2d 875, 69 OBJ 2421, Jackson v. State
Discussed at Length
 1999 OK CR 22, 989 P.2d 960, 70 OBJ 1578, Washington v. State
Discussed
 1999 OK CR 31, 986 P.2d 1145, 70 OBJ 2389, Demry v. State
Discussed
 1999 OK CR 37, 989 P.2d 998, Bernay v. State
Discussed at Length
 1973 OK CR 222, 509 P.2d 675, McDANIEL v. STATE
Discussed
 1973 OK CR 398, 514 P.2d 430, MARUTZKY v. STATE
Discussed
 1986 OK CR 2, 712 P.2d 69, CHATHAM v. STATE
Cited
 1986 OK CR 92, 720 P.2d 1265, SWART v. STATE
Discussed
 1986 OK CR 97, 721 P.2d 810, PLOTNER v. STATE
Discussed
 1987 OK CR 141, 739 P.2d 1009, TEAFATILLER v. STATE
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 581, Duty Not to Converse and Not to Form or Express an Opinion on Any Subject of the Trial
Cited
 12 O.S. 2103, Scope of Rules
Cited
 12 O.S. 2404, Character Evidence Not Admissible to Prove Conduct - Exceptions - Other Crimes
Discussed
 12 O.S. 2611, Mode and Order of Interrogation and Presentation
Cited
 12 O.S. 2703, Bases of Opinion Testimony by Experts
Discussed
 12 O.S. 2705, Disclosure of Facts or Data Underlying Expert Opinion
Discussed
 12 O.S. 2803, Hearsay Exceptions - Availability of Declarant Immaterial
Discussed at Length
 12 O.S. 2804, Hearsay Exception - Declarant Unavailable
Discussed
Title 20. Courts
 Cite
Name
Level

 20 O.S. 3001.1, Setting Aside Judgment on Ground of Misdirection of Jury or Error in Pleading or Procedure
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 701.7, Murder in the First Degree
Discussed at Length
 21 O.S. 701.8, Second Degree Murder
Cited
 21 O.S. 701.12, Aggravating Circumstances
Discussed at Length
 21 O.S. 701.13, Review of Death Penalty Sentence
Cited
 21 O.S. 711, First Degree Manslaughter
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 659, Classification of Particular Causes of Challenge
Cited
 22 O.S. 991a, Sentence - Powers of the Court
Discussed at Length
 22 O.S. 991b, Revocation in Whole or in Part of Suspended Sentence - Hearing - Review
Cited
Title 57. Prisons and Reformatories
 Cite
Name
Level

 57 O.S. 512, Supervision of Inmates Paroled from State Institutions - Conditions for Release - Violations
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA